**KOSCOT INTERPLANETARY, INC.,**
Appellant,

v.

**William M. KING, Securities Commissioner
of the State of Texas, Appellee.[1]**

No. 11741.

Court of Civil Appeals of Texas,
Austin.

March 11, 1970.

Rehearing Denied April 1, 1970.

Mitchell, Gilbert & McLean, Arthur Mitchell, Phillip W. Gilbert, Austin, for appellant.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., Pat Bailey, Exec. Asst. Atty. Gen., Edward Esquivel, Sam Kelley, Asst. Attys. Gen., Austin, for appellee.

HUGHES, Justice.

Koscot Interplanetary, Inc., appellant, filed suit in the court below against William M. King, Securities Commissioner of the State of Texas, such suit being in the nature of an appeal from a cease and desist order issued by the Commissioner[2] respecting the use of unregistered marketing plans by Koscot. The basis of the order was in selling and offering to sell these plans Koscot was selling and offering to sell a "security" as defined by Art. 581–4, subd. A, V.T.C.S., without registration as required by Art. 581–7, id.

The Commissioner, declining to agree with Koscot that only certain portions of the definition of a "security" could be applicable to this case insists that the question presented here is whether Koscot's marketing plans are within the defining statute. For this reason, we quote the entire statutory definition of "security" as contained in Art. 581–4, subd. A:

"A. The term 'security' or 'securities' shall include any share, stock, treasury

1. See Koscot Interplanetary, Inc. v. Blackwell, 446 S.W.2d 364, Tex.Civ.App., Austin (1969).

2. Sec. 27, Art. 581–27, V.T.C.S.

stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, pre-organization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Board of Insurance Commissioners when the form of such policy or contract has been duly filed with the Board as now or hereafter required by law."

Koscot has two plans, the old and the new. The "old" plan was in use prior to June 1969 when the "new" plan was put into effect. These plans are essentially multi-level marketing programs for a cosmetic line produced by Koscot.

The basic facts in this case are not in dispute and the Commissioner has accepted Koscot's analysis of the "old" and "new" plans, which analysis we adopt.

Under Koscot's "old" plan, a person could become a beauty advisor by paying $10.00 to a Koscot distributor, for which she would receive a "starter kit" containing samples of Koscot products with a total retail value of $35.50; or, she could purchase a more complete sampling of Koscot products, in a much more elaborate display kit, known as the "professional Koscot kit," for $45.00, the total retail value of the kit and its contents being $112.00. The sole function of the beauty advisor was to sell Koscot products at retail. She received a bonus of $100.00 for each Supervisor that she was responsible for recruiting into her sponsor's organization. That bonus was paid to her by her sponsor. The Beauty Advisor had to complete a course of retail training provided for her by her Director. She was expected to service her customers every month, had to maintain a record of all of her customers and sales and submit a copy of her records to her sponsor. The Beauty Advisor received her products directly from her sponsor, buying the product at 35% off of its recommended retail price. There were also provisions for refund bonuses based on the Beauty Advisor's total retail volume during each month.

The second level of Koscot's distribution system, under the old plan, was that of "Co-ordinator," who was otherwise known as a "Retail Manager." Persons became Co-ordinators by purchasing a "display pack" of Koscot products for $98.48 and by paying an entrance fee of $25.00 (totaling $123.48). The display pack contained a very broad sampling of Koscot products, with a total retail value of $151.50. The Co-ordinator's functions were both retailing Koscot products and also recruiting Beauty Advisors and other distributors into the Koscot distribution system. The Co-ordinator had to complete a course of training which emphasized both the retail and wholesale aspects of Koscot. The Co-ordinator's main function was recruiting Beauty Advisors and supplying them with Koscot products for sale. The Co-ordinator purchased her products directly from her sponsor at a 35% discount off of the recommended retail price. Her profits on retail sales consisted of the retail markup for those products she sold directly to consumers, and of refund bonuses based on her total monthly purchases, which would provide her a profit differential on selling the

products to her Beauty Advisors, if her several Beauty Advisors had sufficient purchase volume each month. The Co-ordinator also earned a $25.00 finder's fee each time she sponsored a new Co-ordinator. She also received a finder's fee of $200.00 each time she sponsored a Supervisor into the Koscot distribution system. These finder's fees were paid directly by the Co-ordinator's immediate sponsor.

The third position under the old plan was that of Supervisor. Persons became Supervisors in one of three ways. The first method was by paying $2,000.00, for which the Supervisor received $2,500.00 worth of Koscot cosmetics, at their retail value, plus sales aids, and thorough training for himself in wholesaling Koscot cosmetics, plus extensive training for a woman manager of his choice to handle the retailing of Koscot cosmetics in his organization.

The second method for becoming a Supervisor was by purchasing for resale a total of $2,500.00 in retail value of Koscot cosmetics (while being a Beauty Advisor or Co-ordinator), plus then sending $800.00 to Koscot Interplanetary, Inc. to cover payment of finder's fees for his sponsor, and training for himself and a woman manager of his choice. This method was known as the "work in" method since it was used by Koscot retailers who had attained sufficient retail volume to become wholesalers; and the third method for becoming a Supervisor was a combination of the buy in and work in methods. The Supervisor was considered a Supervisor of a group of Co-ordinators and Beauty Advisors, and his main functions were to recruit and train his distributors, provide his group with merchandise, and assist his organization in increasing the quality of their service to the consumer. The Supervisor was required to acquire necessary business licenses, retail tax permits and, to collect sales taxes based on retail prices. He was required to maintain an adequate inventory of Koscot products for resale to his Co-ordinators and Beauty Advisors. The Supervisor purchased Koscot products from his Director, at a 55% discount from the recommended retail price for the products, and he sold those products at a 35% discount off of recommended retail price, to his Co-ordinators and Beauty Advisors. The Supervisor also received a finder's fee of $500.00 directly from Koscot Interplanetary, Inc., upon selling a Supervisor's order (with a payment of $2,000.00 for $2,500.00 in retail value of products, etc.) to an incoming Supervisor. The Supervisor could also receive a finder's fee of $25.00 for each Co-ordinator that he sponsored into the Koscot distribution system.

Under the old plan, a person could not begin as a "Director" in the Koscot distribution system. He had to first become a Supervisor (for which he would have paid $2,000.00 and received $2,500.00 in retail value of Koscot products, etc.). Further, since he would be taking all of his Co-ordinators and Beauty Advisors with him when he became a Director, it was necessary that he replace himself with a new Supervisor, to work under his Director, prior to his leaving the organization and setting up his own Director's organization. Further, since Directors purchased Koscot's products from Koscot at a 65% discount off of the recommended retail price, and since he sold those products to his Supervisors at a 55% discount, and since the sponsoring Director would lose that 10% differential if his Supervisor left his organization and established a new directorship, the Director-to-be was required to pay a release fee of $2,500.00 to his Director once he had decided to establish his own directorship. Further, it was necessary that the would-be Director complete retail and wholesale training within sixty days of his advance to the Director's position. Also, to become a Director, he had to receive official written approval of his application from Koscot. The Director was responsible for business and cosmetic training meetings for his entire organization. He was responsible for supplying his Co-ordinators and Beauty Advisors, and if he did not have Supervisors under him, he

was required to obtain any necessary business licenses and retail tax permits, and he collected sales taxes based on the retail value of products being sold by his Co-ordinators and Beauty Advisors. Like the Supervisor, the Director was supposed to have a woman manager trained to handle the retail portion of his organization. He also used his woman manager to train Beauty Advisors and Co-ordinators in his organization. He was responsible for retail volume refund bonuses paid to persons in his organization. The Director's income was based on a price differential in connection with the sale of Koscot products, which he was purchasing at a 65% discount off of the recommended retail price, and which he sold to his Supervisors at a 55% discount, or in case he had Beauty Advisors or Co-ordinators working directly under him, rather than for his Supervisor, he would sell the cosmetics at a 35% discount off of the recommended retail price. The Director also received a finder's fee of $25.00 for each Co-ordinator that he sponsored into the Koscot distribution system; and a finder's fee of $500.00 for each Supervisor he sponsored into the Koscot distribution system; and when any of his Supervisors decided to leave his organization to set up another Director's organization, the sponsoring Director would also receive the $2,500.00 release fee. In addition, under the old plan, the Director continued to earn 2% of the retail volume of the entire organization controlled by each of his Supervisors who became a Director. The Director even under the old plan could not receive any income from any other organization of distributors, where he had not initially brought the Supervisor up through his own organization prior to having the Supervisor set up his own directorship and distributors organization.

Under the "new" plan of marketing, the Koscot distribution system works as follows. Again, a person may become a Beauty Advisor by paying $10.00 for a "starter kit" containing Koscot products, and having a retail value of $36.00; or she may choose to purchase a "professional kit" for $45.00, which kit and its contents of Koscot products, has a retail value of $112.-50. Again, the Beauty Advisor's function is the retail of Koscot products. She is required to complete a course of retail training provided by her Director and she is expected to service her customers every month and maintain a record of all of her customers and sales and submit copies of her records to her sponsor. Now, however, she purchases Koscot products at a 40% discount (rather than a 35% discount) off of the recommended retail price. She is no longer encouraged, even by nominal finder's fees, to recruit persons into the Koscot distribution system. Thus, the $100.00 bonus for recruiting Supervisors is deleted.

The Co-ordinator level is not present in the new plan, and the second level of distribution is now the Supervisor level. Again there are three methods for becoming a Supervisor. The first method involves the payment of $2,000.00 by the would-be Supervisor, for which he receives $1,500.00 worth of retail value of Koscot cosmetics and $500.00 in retail value of hair fashions, plus membership in a related credit card corporation, thorough training for himself and training for a retail manager of his choice to handle the retail aspects of his organization. Secondly, a person may become a Supervisor by the "work in" method by purchasing for resale a total of $5,400.00 in cosmetics from his sponsor over a six-calendar month period. It then becomes his personal responsibility to train a retail manager of his own choice. Thirdly, persons may combine the "work in" and "buy in" methods, such as in the case where a Beauty Advisor has sold close to $5,400.00 worth of Koscot cosmetics in less than six months, and she chooses to make up the remainder of the $5,400.00 by a lump sum purchase, in order to become a Supervisor. Again, the Supervisor is considered a Supervisor of a group of Beauty Advisors. The Supervisor's position combines wholesale and retail selling. His function is to recruit and adequately train

his Beauty Advisors, provide his group with merchandise and assist his organization in increasing the quality of their service to the consumer. He must train his organization in business procedures and supply them with products as he receives orders. The Supervisor must acquire business licenses and retail tax permits, and he collects sales taxes on retail value of products sold by his organization. The Supervisor purchases his product directly from his Director at a 55% discount off of its recommended retail value, and since he sells the product to his Beauty Advisors at a 40% discount off of retail, his profits are in the differential between his purchase price and his sales price. The Supervisor also receives commissions for selling a new Supervisor's order (which is in the amount of $2,000.00), and his commission of 25% on that sale amounts to $500.00. The phraseology of finder's fee used in the old plan, and commission, used in the new plan, is irrelevant, since the fact is that the Supervisor has sold a significant amount of Koscot products for a significant price, and his payment is related to that sale, made by him.

Under the new plan, as in the old, a person may not begin as a Director. He is required to have been a Supervisor prior to becoming a Director. Also as in the old plan, before leaving his Director's organization, a Supervisor must sell at least one new Supervisor's order for his Director before leaving his organization and establishing his own independent distributorship organization. Unlike in the old plan, however, once the Supervisor is otherwise qualified, he does not pay a $2,500.00 release fee to his Director, but rather is required to purchase an additional $3,000.00 in retail value of Koscot inventory, from his Director, for the sum of $3,000.00. Thus, a would-be Supervisor has paid $2,000.00 for $2,000.00 worth of retail value of Koscot product (instead of receiving $2,500.00 in retail value of such product, as in the old plan), but he has paid $3,000.00 on becoming a Director and has now received $3,000.-

00 in retail value of Koscot product (rather than merely paying a release fee to release himself from his Director's organization, as in the old plan.) Of course, the would-be Director, as in the old plan, must complete retail and business training within sixty days after becoming a Director. Unlike in the old plan, a Director does not continue to receive 2% of the retail sales volume of his former Supervisors who have become independent Directors with their own organizations. The Director's responsibilities are very similar to those under the old plan, and include responsibility for training himself, and for handling business and cosmetic training meetings for his organization. The Director may sell at wholesale or retail, but he is responsible for supplying his Supervisors, and any Beauty Advisors in his organization who do not have Supervisors. The Director is the only person, under the new plan, who receives his product directly from Koscot. Since the Director purchases at a 65% discount off of the recommended retail price of Koscot cosmetics, and since he sells those products to his Supervisors at a 55% discount, he earns the differential between those two prices on sales to his Supervisor, and he earns the differential between his 65% discount purchase price, and the 40% discount purchase price on sales to his Beauty Advisors, where no Supervisor is directing their activities. Also, the Director receives the same special commission for selling a new Supervisor order of $2,000.00, namely a 25% commission or $500.00. There is also a "work in" method for becoming a Director, where the Supervisor has sold $16,800.00 in retail purchase volume of Koscot products.

In commenting on the above analysis, the Commissioner states that it is not clear that under the old plan the sole function of the Beauty Advisor was to sell Koscot products at retail since the Beauty Advisor receives $100.00 for each "Buy-in" Supervisor she procures. Also, in commenting on the "new" plan, the Commissioner points out that once a Supervisor decides to move to

Director he does not pay a $2,500.00 release fee to his Director but is required to purchase an additional $3,000.00 of Koscot products at retail price and must create a new Supervisor's order for Koscot products, after which Koscot sends the Director of the organization from which the Supervisor advanced 65% of the $3,000.00 purchase. The Supervisor in order to advance to Director buys the additional required inventory without any product purchase discount.

The Commissioner also directs attention to the "extremely important fact" that every person who becomes a distributor of Koscot under the "old" or "new" plan has the opportunity of recruiting and enrolling new distributors, and that the plans to recruit and enroll new distributors were devised, introduced and implemented in whole, or in part, by Koscot. This portion of the two plans is called the "wholesale" operation and is to be distinguished from the sale of Koscot products at retail prices to the ultimate consumer. This latter, or "retail" operation is unaffected by this suit.

Trial to the court culminated in a judgment decreeing that the sale and offer for sale of "Director," "Supervisor" and "Coordinator" distributorships under the multi-level referral sales plans of Koscot was a sale and offer for sale of a "security" within the meaning of Art. 581–4, subd. A, and that such sales and offers for sale should cease and desist until such time as Koscot complied with the Securities Act with reference thereto. Excluded from the judgment were sales made at retail and the recruitment of Beauty Advisors to sell at retail.

The trial judge filed findings of fact. After finding that Koscot had not complied with the Securities Act, he found that the plans being sold or offered for sale by Koscot were based on written manuals and oral representations; that persons investing in these plans were able to sell Koscot products at retail as well as to sell distributorships; that persons investing in a distributorship were led to expect that they had the opportunity to realize large profits through the efforts of others, the amount to be earned being largely under the control of Koscot who must approve those who invest in distributorships; that Koscot can change its plans at any time without notice to investors; that the principal attraction to prospective-investors in these plans is the large profits to be expected through the sale of distributorships; that Koscot represents and encourages the belief that the selling of distributorships is to be accomplished through the efforts of others with a minimal amount of effort to be exerted by the individual investor; that the success of Koscot lies in the promotion of these plans rather than in the selling of its products at retail; that the right to receive income or profits from the sale of distributorships under these plans rather than the right to sell products at retail is the principal reason a person invests in Koscot; and, that Koscot obtains working capital through the sale of distributorships.

Many witnesses testified. The details of the two plans and their actual operations were explained. Without exploring the testimony of these witnesses minutely, it is fair to say that they reflect a belief on the part of some who were involved in the business that huge profits were to be made by expansion of the programs through the sale of distributorships rather than through the retail sale of Koscot products. In fact, some witnesses testified that they never expected to sell at retail.

We cannot find, however, in any of the testimony or in the documentary evidence any suggestion that solely through the money invested under the plans could profits be expected. The prospective purchasers were repeatedly told that only those who were ambitious and willing to work could succeed. In truth, the Commissioner states that he "does not contend that the schemes involved herein lead people to believe that they can realize profits solely from the efforts of a third party. This is a hybrid case, therefore, as far as the

legal authorities in the United States are concerned. In this case, the investor can realize profits from his own efforts as well as from the efforts of third parties."

Koscot's first twenty-nine points are briefed together. In various ways these points present the primary question of whether its marketing plans are a "security" as defined in Art. 581–4 subd. A. Examining this article, we are convinced that only the words "certificate in or under a profit sharing or participation agreement" and "any certificate or instrument representing or secured by any * * * investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not," have any conceivable application to this case.

In Securities and Exch. Com. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Court construed a Federal Statute defining securities, in part, as any " 'certificate of interest or paritcipation in any profit-sharing agreement' 'investment contract' and 'in general, any interest or instrument commonly known as a "security" ' * * *." Under the facts of that case, the Court held that the meaning to be given the term "investment contract" was determinative. It gave this meaning to that term:

"An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938. This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves. * * *

In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. * * * The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. * * * The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value."

Howey was followed recently by the circuit court, Ninth Circuit, in Chapman v. Rudd Paint & Varnish Company, 409 F.2d 635 (1969). In that case it was held that a distributorship agreement was not a security under federal law because it did not provide that the distributor would obtain his profits solely from the efforts of others. We quote from that opinion:

"The brochure, on the basis of which plaintiff was attracted to Rudd and its distributorship plan, and on the basis of which plaintiff made an initial five thousand dollar deposit, provides the only background factor of substance to be considered in this case. The brochure contains statements which seem to minimize the amount of effort which a distributor must exert, and maximize that which Rudd would contribute. Moreover, the brochure makes reference to terms which would be as appropriate in an investment contract as in an ordinary distributorship agreement.

In addition, the brochure contains profit projections allegedly based on market tests and sales data, places emphasis on the past record, success and potential of Rudd, and makes reference

to the assistance to be rendered the investor by that company. The brochure describes the distributorship as a 'Turn-Key' operation into which the investor merely steps, whereupon he is immediately involved in ' * * * a substantial and profitable undertaking with a minimum obligation on his time or resources.' It enthusiastically describes Run-Guard as a revolutionary 'self-serving' product.

On the other hand, the very fact that the brochure emphasizes the amount of assistance the company will provide implies that the distributor is also to contribute an effort. The brochure contains no financial data on Rudd, nor any balance sheet figures or information concerning the company's past earnings record. Read in its entirety, the brochure is not a prospectus pertaining to a security, but rather an outline of a distributorship program relating to a product to be marketed by the distributor, through his own efforts, at retail and wholesale outlets within his designated territory."

State courts, too, have followed Howey.

In Emery v. So-Soft of Ohio, Inc., 199 N.E.2d 120, Court of Appeals, Ohio (1964) it was held that a referral agreement whereby seller of water conditioner agreed to pay buyers $100.00 for each name furnished by buyer which resulted in sale of a water conditioner was not a security, the Court saying:

"We are in complete accord with the trial court's ruling that the distinguishing feature between the referral agreement and a security under the Ohio Securities Act is that any profit or return to a party based on the referral agreement in question must result from the personal efforts of the party receiving the profit or return, that if the party executing such agreement does nothing and fails to perform the services called for by the terms of the agreement, he receives nothing, and that if the party performs the obligations imposed upon him, he is entitled to be compensated in the same manner as provided by employment contracts or commission-type agreements, whereas a security has in contemplation complete reliance upon the effort of the seller for any return to the purchaser.

The plaintiffs were required to earn the promised remuneration contained in the agreement. Therefore, it is our belief that the referral agreement in the instant case is not a security under the provisions of Sections 1707.01 to 1707.99, Revised Code."

A similar holding was made in Commonwealth ex rel. Pennsylvania Securities Commission v. Consumers Research Consultants, 414 Pa. 253, 199 A.2d 428, Supreme Court of Pennsylvania (1964). The statutory definition of "Security" in Pennsylvania contained the phrases, "investment contract" and "in or under a profit sharing or participation agreement." A purchaser of an appliance was promised $100.00 for each lead furnished by him resulting in a sale. The Court held that this was not an investment contract, citing Howey.

In Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2d 841 (1968), a statute defining a "Security" contained the phrases, "Certificate of interest or participation in any profit sharing agreement" and "investment contract" was held not to cover founder's contracts under which commissions received by supervisors and distributors depended upon their own efforts and not the efforts of others, the Court citing and relying upon Howey in holding that the arrangement was not an "investment contract."

Howey is literally followed in Blackwell v. Bentsen, 203 F.2d 690, Fifth Circuit, cert. dism. 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1953). There 20 acre tracts were sold and contemporaneous contracts were executed between the parties whereby the seller agreed to plant and manage citrus trees on the land, the buyer to realize

certain profits. This was held to be an "investment contract," the Court saying,

"This is not an ordinary purchase of land as such. It is an investment for the purpose of producing an income through the activities of others than the owner." If no management contracts were made, then the Court said the mere purchase of the land would not constitute an "investment contract."

The Commissioner cites Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) as indicating that the Supreme Court will have a change of heart and relax its holding in Howey where, as he contends here, policy considerations are overwhelming. We do not see how this case can help the Commissioner. The Circuit Court refused to apply the test laid down in Howey for determining what is an "investment contract." The Supreme Court held this was error, applied the Howey test, and reversed the case.

The Commissioner cites two cases which decline to follow the decision in Howey, Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693, District Court of Appeal of Florida, 2nd District, (1969) and State of Hawaii v. Hawaii Market Center, Inc., Circuit Court of the First Circuit, State of Hawaii (1969). The Florida decision was by a divided court and review has been granted by the Supreme Court of Florida. The Hawaii decision was by a trial court and cited the Florida decision in Antinori.

The status of these two cases is not such as to make them authoritative.

Koscot has cited as an additional supporting authority, Georgia Market Centers, Inc. v. Fortson, 171 S.E.2d 620, Supreme Court of Georgia (December, 1969). This case has not been officially reported and is not available to us.

■ We do not underestimate the difficulty of the Commissioner in policing all of the "get rich quick schemes" which the fertile mind of man can invent. The problem is that his authority is prescribed by law. Not all "get rich quick schemes" are a "security." We believe that the governing law has been settled by the decisions of courts of last resort which have been cited. We find no over-powering reason to disregard these decisions and innovate as the lower courts in Florida and Hawaii have done.

 It is our opinion that the marketing plans of Koscot do not fall within the definition of "Security" prescribed by Art. 581-4A, for the reason that the investors in such plans do not depend solely upon the efforts of others for income and profit.

Other points made by Koscot need not be determined.

The judgment of the trial court is reversed and judgment is here rendered vacating the cease and desist order issued by the Commissioner against Koscot.