R. E. BRUNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 42629.

Court of Criminal Appeals of Texas.

Sept. 23, 1970.

Emmett Colvin, Jr., Dallas, (on appeal only), for appellant.

Henry Wade, Dist. Atty., John B. Tolle, Camille Elliott, James P. Finstrom and John Stauffer, Asst. Dist. Attys., Dallas, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Judge.

The offense is a violation of the Securities Act (Article 581–29, Vernon's Ann. Tex.Civ.St.); the punishment, a $2500 fine.

Omitting the formal parts, the first count of the indictment reads as follows:

"* * * that one R. E. Bruner on or about the 23rd day of May, A.D. 1967, and anterior to the presentment of this indictment, in the County and State aforesaid, did then and there unlawfully engage in the business of a dealer in securities, and was then and there a dealer in securities by selling, offering for sale, soliciting subscriptions to and orders for securities, and did then and there sell and offer for sale to Dennis E. Owens and did then and there solicit of and from Dennis E. Owens a subscription to and order for a certain security, to wit:

"an investment contract and profit-sharing agreement wherein the said R. E. Bruner represented and agreed on or about the 23rd day of May, A.D. 1967, with the said Dennis E. Owens that he, the said Dennis E. Owens, a purchaser of said security would be entitled to an interest in the profits of National Marketing Association, in that a certain amount of the Terrific Products Co. Cleaning Concentrate purchased for the said Dennis E. Owens at a 50% discount of retail price in consideration for the payment by the said Dennis E. Owens of $1,350.00 to the said R. E. Bruner would be sold and caused to be sold by National Marketing Association for the benefit of the said Dennis E. Owens and the said Dennis E. Owens would receive a 50% cash profit on said sale; and the said R. E. Bruner further promised, represented and agreed with the said Dennis E. Owens that he, the said Dennis E. Owens, as the purchaser of said security would be further entitled, in consideration for the payment of said $1,350.00 by the said Dennis E. Owens to the said R. E. Bruner to a portion of monies to be obtained by National Marketing Association and its agents through the sale of securities to other such persons thereafter who were to be invited by the said Dennis E. Owens to free dinners provided by National Marketing Association for solicitation of such investments by National Marketing Association and its agents, and to a portion of monies to be obtained by National Marketing Association and its agents through the sale of securities to each and every suceeding invitee of the said Dennis E. Owens invitees in like manner thereafter:

"and said security was issued after September 6, 1955, and was then and there not registered by notification by and with the Securities Commissioner of the State of Texas, and said security was then and there not registered by co-ordination by and with the Securities Commissioner of the State of Texas and then and there no permit for the sale of said security had been granted by the Securities Commissioner of the State of Texas, all as is provided by law in such cases and the said security was not then

and there a duly registered security, duly registered as such by and with the Securities Commissioner of the State of Texas * * *."[1]

The second count charged the appellant with selling and offering for sale a security without being a registered dealer.

Both counts were submitted to the jury and the appellant was found guilty under the first count of the indictment.

We are confronted at the outset with appellant's contention that the evidence is insufficient to sustain the conviction since the agreement or transaction involved is not a "security" within the meaning of the Texas Securities Act. Our problem is compounded since the facts were not developed as well as they might have been, and much of the direct examination of the complaining witness was by use of leading questions which only served to confuse rather than clarify the transaction involved.

Dennis Owens, an oil and gas well tester, related that at the invitation of a friend (named Thompson) he attended several dinner parties at a fashionable Dallas restaurant given by the National Marketing Company where the guests were entertained by an after dinner speaker and merely asked to sign a card if they were interested in the investment program of the company.

On May 23, 1967, Owens testified he was contacted by a man whom he believed to be the appellant and that later on the same date the appellant and another employee of the National Marketing Company appeared at his office in Dallas and demonstrated to him and his secretary a soap product of the Terrific Products Company, Inc. for whom National Marketing Association was exclusive sales agent and discussed with him the "investment contract" of the company. He related that appellant told him he could invest $300 or more, but that an investment of $1350 would place him in a "higher bracket" as far as dividends and profits were concerned, at a level of "fifty percent"; that in addition, while he would be obligated to endeavor to bring guests to dinner parties given by the company, he would share in "profits and dividends" as a result of the investment made by any of such guests as well as the investments made by future invitees of his guests. Owens further related when he protested that he had a business and did not want to sell soap door-to-door he was assured he did not have to do so for the soap could be disposed of through the people he would bring to the company dinners.[2]

It also appears Owens understood he was to also share generally in the "profits and dividends" of the company,[3] and if he was

---

1. It is observed that the first count of the indictment does not allege that it was represented to Owens that he would generally share in all profits of the National Marketing Association.

2. The record reflects the following on cross-examination of Owens:
   "Q. And the profit that you were to make was upon the resale of the soap you bought at a wholesale price, was it not?
   "A. No.
   "Q. What was it?
   "A. It was people that I brought to the dinners that later on bought that soap. * * * *"

3. On direct examination the following is found:
   "Q. Will you tell the jury *in your own* words whether you were to share in any profits in any products that the National Marketing Association would put on the market?
   "A. *Yes.* (emphasis supplied)

   "Q. Mr. Owens, from anything that was told you, did you think that your thirteen-hundred-and-fifty dollar investment entitled you to some ownership in National Marketing Association?

   "A. At the time it was presented I thought I would be entitled to everything they had to offer, and what they had to offer, I'm not quite sure about right now."

not satisfied he could have his money refunded within a period of 90 days.

On the date in question Owens signed the following "application and agreement":

---

**NATIONAL MARKETING ASSOCIATION**
Exclusive Sales Agents For
TERRIFIC PRODUCTS COMPANY, INC.
2010 N.W. 22ND STREET • (405) Windsor 3-5789
OKLAHOMA CITY, OKLAHOMA 73107

**APPLICATION AND AGREEMENT**

Date *5-23* 196*7*

CHECK STATUS
( ) Area Director
( ) Division Manager
( ) District Supervisor
( ) Local Dealer

Name *DENNIS E. OWENS*

Address *2705 W. LEDBETTER*

City *DALLAS* State *TEXAS*

Assigned IBM Code Number

Phone *FE 13630* Zip Code *75233*
No. ...............

I, *DENNIS E. OWENS* ............, the undersigned, in consideration of the terms and conditions set forth herein to be performed by me and Terrific Products Company, Inc. ("Company"), do hereby apply for status in the TERRIFIC SUCCESS PLAN indicated above. In the event my application is approved, this Agreement will become effective and I agree to accept full responsibility for the performance of my duties set forth herein and as set forth in the Terrific Sales Manual, a copy of which I have received and which may be supplemented and amended from time to time by the Company.

Further, I agree that any violation of the responsibilities vested in me under this agreement shall constitute sufficient grounds for the cancellation of this agreement without notice.

I agree to abide by the policies of the Company now in effect and such other policies as may from time to time be established by the Company for the ethical and business-like development of the business and the sale of Company products. The General Policies are set forth below:

1. I will endeavor to attend all Success Meetings and bring one or more guests each week.

2. All purchases made by me shall be at the then in effect net price list of the Company, F.O.B. Oklahoma City. A Cashier's or Certified check shall accompany all orders in the full amount of the purchase price.

3. I will abide by all applicable City, State and Federal Laws in the operation of my business.

4. This agreement is not to be construed as an agreement creating a contract of Agency, Employee, Partnership, or Joint Venture with the Company. My relationship with the Company is strictly that of an Independent Contractor.

5. This agreement shall be for a term of one year from the date hereof and shall be automatically renewable for consecutive one year periods at my option unless terminated prior to renewal date by me or by the Company for failure to abide by the policies, rules and regulations of the Company.

6. The products of the Company are UNCONDITIONALLY guaranteed. Customers must be completely satisfied with the product or the entire purchase price will be refunded without question. Details of this refund procedures are found in your Sales Manual.

The following two paragraphs apply only to the status of Area Director and Division Manager:
(a) I recognize my full responsibility to every person working in the Terrific Program and especially to those under my direction and I agree to diligently perform the following functions to the best of my ability.

(b) The proper instruction of all new people is most important and I agree to give careful and earnest attention to this work in order that every individual may do his best and earn the greatest reward and stimulate interest in the product and plan.

(c) To maintain a sufficient inventory of product and sales aids to supply all people working for me and I agree to do so at all times.

(d) Through my own knowledge and enthusiasm I will use my best effort to motivate my people, assist them wherever I can towards attaining greater heights by:

Holding regular weekly Success Meetings.
Stimulating the "Help a Friend-Bring a Friend" slogan.
Establish realistic goals for my people.
Contacting my people in person or by telephone at least once weekly.
Instill great caution among my people against misrepresentation of the product.

[A2804]

Preparing proper reports as required and submitting same to
Company when due outlining the progress of my people and
my own goals and accomplishments.

I have this day and date above written signed this agreement and placed my initial order with the
Company.

X ..... *Dennis E. Owen*

Signature

Sponsor:
Name ... *H.E. THOMPSON* .........    Accepted and approved by:
Address .................................    .......... *R.E. Bruner* ..........
City .................... State .............    Area Director—IBM No.
Level ............... IBM No. .............    Address ..............................
                                               City .................... State .............

National Marketing Association will reserve and guarantee 6 (SIX)
local markets if dealer is participating in "MARKETING PROGRAM" at the
cost to dealer of $225.00 per market.

National Marketing Association hereby agrees to repurchase all unsold mer-
chandise at the end of a 90-day period if dealer is not completely satisfied
with progress of himself and/or National Marketing Association. Any profits
paid to dealer will be deducted from said proceeds which will result in
placing the dealer in exactly the same cash position as that prior to joining
the program.

*Edward Holt*
President, National Marketing Assn.

By *R E Bruner*

932 Exchange Bank Tower
214 - FL 8-4401
Dallas, Texas

[A2803]

Owens testified that subsequently on June 2, 1967, a John Brewer, an employee of the company, came to his office and picked up his check for $1,350 made payable to the National Marketing Company.

He admitted he made no investigation of the company, did not know whether it was a corporation, partnership, sole proprietorship, etc., and did not ask for a balance sheet.

In August of 1967 he received a warehouse receipt stating there was certain merchandise on deposit in his name at the location described.

Owens revealed he attempted to get his money refunded, and, while his friend Thompson was successful, he was rebuffed at the company's office with the statement that no one with the right to authorize the refund was present. Later he discovered the office closed and the phone disconnected and he never recovered any of his money.

He testified that he never bought any merchandise and that he had been assured he would not have to sell soap from door-to-door in order to realize any profit.

It was shown by the testimony of Hugh Wright, a senior examining attorney for the State Securities Board, that the appellant Bruner was not licensed as a dealer in securities nor was the National Marketing Company so licensed. Further, it was shown that the National Marketing Association had not registered any securities to be sold and that a permit had not been granted for the sale of any such securities. He testified, without objection, that in his personal opinion the transaction involved constituted a "security."

Testifying in his own behalf appellant related he had been hired in Oklahoma City as a salesman by the National Marketing Company, transferred to Dallas, then to Houston and back to Oklahoma City where he terminated his employment when he learned that a securities investigation of the company was being made. He testified he sold at wholesale prices the all-purpose cleaner or soap product of the company in quantities not less than $300 worth, which amount entitled the purchaser to quantity discount and the discount increased along with the amount of soap purchased; that purchasers would then sell at retail price to other individuals. He also related that a purchaser could dispose of the soap purchased through individuals he brought to the company dinners. He stated that the profit made by a purchaser was dependent upon the amount of the merchandise sold.

He acknowledged that he had gone to Owens' office and demonstrated the soap product but denied that he talked about dividends or told Owens anything that could be construed as leading him to believe he would generally share in the profits of the company or that he would receive anything from his guests' purchases of soap. He denied selling a "security" or offering the same for sale.

He stated that when the "application and agreement" was signed, Owens did not know what amount he wanted to buy and his status on the agreement as Area Director, Division Manager, District Supervisor, or local dealer was not checked. He indicated the status was dependent upon the amount of soap purchased and Owens did not give the company a check until some days later. The appellant related he personally informed Owens that his merchandise was available (in the event he wanted it in his possession) at 6115 Denton Drive, Love Field Warehouse. He stated that when individuals indicated they did not want to personally sell the soap, a "warehouse receipt" was issued by the company (not the warehouse) to the purchaser though he had not personally handled Owens' receipt.

In rebuttal the State called William Marshall, General Manager of the Love Field Warehouse at 6115 Denton Drive, who testified he had nothing in storage there for Owens but that National Marketing Com-

pany had leased 120 feet of space and still had some cases there.

Article 581–4(A), V.A.T.S., defines a "security" as follows:

"The term 'security' or 'securities' shall include any share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Board of Insurance Commissioners when the form of such policy or contract has been duly filed with the Board as now or hereafter required by law."

The indictment in the case at bar alleges the security involved to be an "investment contract and profit sharing agreement."

These terms are variable terms and are not expressly defined in the statute.[4] We must therefore apply some test to determine whether a particular agreement or contract comes within the meaning of one of these terms. With the exception of Koscot Interplanetary, Inc. v. King, Tex. Civ.App., 452 S.W.2d 531 (writ of error pending), the appellate courts of this state have established no formula by which to determine if agreements or contracts such as the one here involved come within such terms.

"It has been said that there should be no hard and fast rule by which to determine whether that which is offered to a prospective investor is such a security as may not be sold without registration or official sanction, and since the existence of such a rule would aid the unscrupulous in circumventing the law, it is better to determine in each instance whether a security is in fact of such a character as fairly to fall within the scope of the statute." 163 A.L.R. 1050, 1053.

In S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the United States Supreme Court in construing the Federal Securities Act, similar to the Texas statute, held that the meaning to be given the term "investment contract" was determinative.

The Court said:

"An investment contract thus came to mean a contract or scheme for the placing of capital or laying out of money in a way intended to secure income or profit from its employment. State v. Gopher Tire and Rubber Co., 146 Minn. 52, 56,

4. In Haberman v. Equitable Life Assur. Soc., 5 Cir., 224 F.2d 401, reh. den. mod. on other grounds, 5 Cir., 225 F.2d 837, the Court, in construing former Article 600a, Sec. 2(a) (Now Article 581, Sec. 4(A), supra), said: "The rule of construction that the meaning of statutory words is to be determined by their context, or *noscitur a sociis*, should be applied in determining the meaning of 'investment contract' in the Texas Act. These words having no fixed technical meaning, their meaning must be ascertained from the specific terms in connection with which they are used; that is, they should be interpreted as referring to instruments of the same general type as the specifically enumerated ones. * * * "

177 N.W. 937, 938. This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves * * *.

"In other words, an investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. * * * The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test is satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsive value."

The Howey test was cited and appears to have been followed by the Fifth Circuit Court of Appeals in Blackwell v. Bentsen, 203 F.2d 690, cert. dism. 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078. In Roe v. United States, 287 F.2d 435, 438, the same circuit court said:

"Expressed somewhat different, the 'test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'"

The Ninth Circuit Court of Appeals recently applied the Howey test in holding that a distributorship agreement was not a security under the Federal Securities Act because it did not provide that the distributor would obtain his profits solely from the efforts of others. Chapman v. Rudd Paint and Varnish Company, (9th Cir.), 409 F.2d 635; see also Penfield Co. of Calif. v. S. E. C., (9th Cir.), 143 F.2d 746, 154 A.L.R. 1027, cert. den. 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614; Brewer v. S. E. C. (9th Cir.), 145 F.2d 233; Los Angeles Trust Deed and Mortgage Exchange v. S. E. C. (9th Cir.), 285 F.2d 162; Darwin v. Jess Hickey Oil Corp., 153 F.Supp. 667 (N.D.Tex.); 163 A.L.R. 1050, 1055.

State courts too have taken note of the Howey test and applied the same.

In Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2d 841, the Alabama Supreme Court held that the founders' contracts, which arose out of a unique merchandising method, and under which commissions received by supervisors and distributors depended not upon efforts of third persons but on their own efforts were not "investment contracts" within the purview of the Alabama Securities Act.

After discussing the Howey test the court said, and we quote since it appears pertinent to our fact situation:

"We come then to a determination of whether the profits made by the supervisors and distributors here depend solely upon the efforts of others. Clearly not. It is apparent from the facts set forth above that the commissions received by these people depend not upon the efforts of third persons, but upon their own efforts. They are paid sums dependent upon sales made by the Alabama Market Centers to customers procured through their efforts. A distributor receives no compensation or commissions unless the persons to whom he delivered purchase cards make purchases at the Alabama Market Center. A supervisor receives no money unless sales of merchandise are made to people who have received purchase authority cards from a distributor who has been 'established' by that particular supervisor.

"It seems clear that any commissions received by a distributor or supervisor are dependent upon the efforts of these distributors and supervisors. * * *"

The Georgia Supreme Court in dealing with a similar founders' contract found the Howey test a workable formula and determined that such contracts were not "investment contracts" within the meaning of the Georgia Securities Act, quoting with approval from Gallion, supra. Georgia Market Centers, Inc., v. Fortson, 225 Ga. 854, 171 S.E.2d 620. There the Court said: "The contract under consideration in the present case promises no return to the Founder except in connection with his own efforts in obtaining other Founders or purchasers for the merchandise to be sold at the market centers. * * * "

Similar results have been reached by the Supreme Court of Pennsylvania and the Ohio Court of Appeals. See Commonwealth ex rel. Pennsylvania Securities Commission v. Consumers Research Consultants, Inc., 414 Pa. 253, 199 A.2d 428; Emery v. So-Soft of Ohio, Inc., Ohio App., 199 N.E.2d 120.

And considering most of the above authorities, our Third Court of Civil Appeals (Austin) reached a similar result applying the Howey test. Koscot Interplanetary, Inc. v. King, Tex.Civ.App., 452 S.W.2d 531.

The State vigorously contends the Howey test should not be applied literally. It urges that the cases cited in Howey do not support the proposition and calls attention to other language in Howey indicating the test "embodies a flexible rather than a static principle * * *."

The State cites Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693, District Court of Appeal of Florida, 2nd District, which was affirmed by the Florida Supreme Court in 232 So.2d 17. The fact situation presented was similar to that of the cases of Gallion v. Alabama Market Centers, Inc., supra, and Georgia Market Centers, Inc. v. Fortson, supra. There the District Court of Appeal declined to apply the Howey test and found the scheme constituted a lottery within the Florida statute prohibiting chain letters and pyramid clubs, as well as violating the Florida Securities Act. One judge, dissenting in part, agreed that the plan was in contravention of the pyramid club statute but could not conclude that the same was a "security" citing the Gallion case from Alabama. In affirming, the Florida Supreme Court merely cited Lippincott Mortgage Investment Co. of Fla., v. Childress, Fla.App., 204 So.2d 919, which involved a lottery and did not even mention the Howey test. In Fortson the Georgia Court noted the Florida decision but did not find it persuasive. Neither do we.

The State also calls our attention to State of Hawaii v. Hawaii Market Center, Inc., an unreported decision by the First Circuit Court of Hawaii (a trial court). The Hawaiian decision also declined to apply Howey literally and cited the earlier Florida decision discussed above. The Court held that where the success of the venture must depend *substantially* on the efforts of others (as opposed to solely), the plan must be considered a security under Hawaiian law.

After the circuit court refused to apply the Howey test in determining what constitutes an "investment contract," the Supreme Court in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564, applied the Howey test and reversed. The Court apparently did indicate that where overwhelming policy considerations were involved, the Howey test might not always be strictly applied.

■ After due consideration we conclude, in light of all of the above authorities, that the Howey test is a workable formula or at least a starting point in determining whether a contract, plan, scheme, etc., is an investment contract under the Texas Securities Act. We are, however, in full agreement with the Georgia Supreme Court in Georgia Market Centers, Inc. v. Fortson, supra, when it said:

"However, we would not mean to infer that this definition should be adhered to with such strictness that a mere token

participation in an enterprise by the person investing capital would prevent the contract from being classed a security. In testing any transaction, 'form should be disregarded for substance and the emphasis should be on economic reality.' Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564."

■ Turning to the case at bar, we observe the appellant contends that the written agreement, standing alone, certainly does not on its face constitute "an investment contract" within the meaning of the Texas Securities Act, and the State should not be permitted the benefit of parol evidence (to which there was no objection) to demonstrate that a "security" is involved. Hollywood State Bank v. Wilde, 70 Cal. App.2d 103, 160 P.2d 846 has been decided adversely to appellant's express contention.

Further, in S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, the Court said:

"The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that the promoters' offerings be judged as being what they were represented to be." 320 U.S. at pages 352–353, 64 S.Ct. at page 124.

"While it is necessary in any case under the Act to prove 'that documents being sold were securities under the Act' which sometimes 'might be done by proving the document itself,' in 'others proof must go outside the instrument itself as we do here.'" 320 U.S. at page 355, 64 S.Ct. at page 125.

In Chapman v. Rudd Paint and Varnish Co., supra, the Ninth Circuit Court of Appeals said:

"However, in determining whether a particular instrument is an investment contract and therefore a security, inquiry does not necessarily stop with an examination of the instrument. Where the terms of the instrument are reasonably subject to varying interpretations, the background facts, including the terms of the offer, the plan of distribution and the economic inducements held out to the prospect, are to be reviewed. SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673; SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L. Ed. 88. Moreover, the brochure is here pertinent because the Securities Act of 1933 prohibits the offer as well as the sale of unregistered non-exempt securities. See Howey, 328 U.S. at 301, 66 S.Ct. 1100, 90 L.Ed. 1244."

■ In determining whether a particular instrument is or is not a security the courts will look to the substance and not to the form of the transaction and will examine all the surrounding circumstances, for the real nature of the transaction is the controlling element. See 79 C.J.S. pp. 943, 944; S. E. C. v. Universal Service Ass'n (CCA Ill.) 106 F.2d 232, 237, cert. den. 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519; S. E. C. v. Payne (D.C.N.Y.) 35 F.Supp. 873, 877, 878. See also Muse v. State, 137 Tex.Cr.R. 622, 132 S.W.2d 596.

■ Turning now to the facts of the case at bar, we come then to a determination of whether the profits to be made by the complaining witness under the plan or scheme depended solely upon the efforts of others. Clearly not. Owens had rejected the idea of his selling the soap personally, and was assured he would not have to do so but that it could be sold to the people whom he invited to the company dinners. Thus, if he did not invite individuals the soap would not be sold and he would fail to realize his expected profit. Further, as to the charge in the indictment that he would also share in profits as a result of any investments made by his invited guests as well as investments made by invitees of his guests, it is clear that

unless he invited guests he could expect no profit at all. Still further, his profits in this regard would depend in large measure upon his continued endeavor of inviting guests, otherwise his profits would become static.

The written instrument in question entitled "Application and Agreement," and signed by the complaining witness indicates that there were certain terms and conditions to be performed by him and that he accepted full responsibility for the performance of his duties set forth in the instrument and in the Terrific Sales Manual, a copy of which the instrument reflects he had received but which is not a part of the trial or appellate record. The instrument further reflects that Owens' status was to be that of an independent contractor.[5] Also the appellant related the payment of $1350 such as made by Owens entitled him to be an Area Director whose duties and activities are described in Sections (a), (b), (c) and (d) of the instrument. The instrument in question neither expressly nor by implication provides that Owens would obtain profits solely from the efforts of others.

It does not appear that Owens was to play the passive role of an investor only. Management was in the hands of the company but profits were not to be realized by Owens without his actual and continued participation. The role was not "minimal" or a mere walk-on, but one that occupied the center stage for most of the play. The expectation of financial return to the complaining witness might have been raised by hopes falsely induced, but since the "agreement" contemplates his active and actual participation, we cannot conclude, viewing the transaction as a whole, that

it constitutes an "investment contract" within the meaning of the Texas Securities Act. Nor is the State's case saved by the addition of the words "and profit sharing agreement" in the indictment. See State v. Heath, 199 N.C. 135, 153 S.E. 855, 87 A.L.R. 37. As noted in Koscot Interplanetary, Inc. v. King, supra, "Not all 'get rich quick schemes' are a 'security.'" Thus the conviction cannot stand. "[A]nd neither numbers of participants nor possible fraud in its creation may transmit the instrument into a security which in legal effect it is not." People v. Syde, 37 Cal.2d 765, 235 P.2d 601. If fraud be involved, redress must be found elsewhere than in the penal provisions of the Securities Act.

We are aware of the familiar rule of statutory construction that remedial legislation should be construed broadly to effectuate its purposes (see Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564) and that a statute regulating the sale of "securities," is to be liberally interpreted. 163 A.L.R. 1050, 1052. And while the fact that the penalties are severe will not authorize an exception to the statute of a transaction clearly within the spirit and letter of the law, Brown v. Cole, Tex.Civ.App., 276 S.W.2d 369, we must recognize that the State Securities Act is highly penal in nature and requires that it be strictly construed. 51 Tex.Jur. 2d, Securities Acts, Sec. 30, p. 699; Carney v. Sam Houston Underwriters, Inc., Tex. Civ.App., 272 S.W.2d 942, err. ref. n. r. e. See also Kadane v. Clark, 135 Tex. 496, 143 S.W.2d 197. A forbidden act must come clearly within the prohibition of the statute and any doubt as to whether an offense has been committed should be resolved in favor of the accused. State v.

---

5. In Chapman v. Rudd Paint and Varnish Co., supra, the Court said in footnote #4, "Nor are we bound by the parties characterization of their legal relationship as stated in the agreement. See S.E.C. v. W. J. Howey, 328 U.S. 293, 300, 66 S.Ct. 1100, 90 L.Ed. 1244;

United States v. Herr, 7 Cir., 338 F.2d 607, 610."
"Labels affixed by the parties are of little moment. Securities & Exch. Commission v. Bailey, (1941, D.C.) 41 F.Supp. 647." 163 A.L.R. 1050, 1057.

Heath, supra; State v. Allen, 216 N.C. 621, 5 S.E.2d 844.

While we cannot condone the activities of the appellant and his confederates, that is not the narrow question before us for decision.

For the reasons stated, the cause is reversed and remanded.