213 So.2d 841

MacDonald GALLION as Securities
Commissioner

v.

ALABAMA MARKET CENTERS, INC.,
et al.

6 Div. 506.

Supreme Court of Alabama.

Aug. 22, 1968.

Earl C. Morgan, Dist. Atty., Birmingham,
for appellant.

Larry S. Vines and Hobart A. McWhor-
tor, Jr., Birmingham, for appellees.

SIMPSON, Justice.

In January, 1967 the Securities Commissioner informed the appellees that the plans, practices and procedures of the Alabama Market Centers, Inc. did not come within the purview or under the provisions of the Alabama security laws "as the Alabama Market Centers, Inc., * * * is not in our opinion selling stocks, bonds, securities, debentures, but is solely in the business of selling commodities and the salesman who introduces a purchaser known as a Supervisor or Distributor receives a commission on persons they introduce to the Market Center who purchase products and that the sale is strictly such items as cooking ware, televisions, sewing machines, etc."

In mid 1967 the Attorney General in his capacity as Securities Commissioner for the State of Alabama filed a bill seeking to enjoin the appellees from the further sale of what the Securities Commissioner now contends are unregistered "securities" as defined in title 53, § 36, Code of Alabama, 1940 (recomp.1958).

The facts were stipulated. The trial court concluded on oral testimony and the stipulation that the "founders contract" involved was not a security or investment contract as defined by the Code. The Attorney General appealed.

The single issue then is whether or not the founders (Supervisors and Distributors) contract involved is a security within the meaning of the security act.

From the stipulation it appears that the arrangement involved is as follows:

"Defendant Alabama Market Centers, Inc. ('A.M.C.') is an Alabama corporation, licensed to do business in the State of Alabama, having its principal place of business in Birmingham. All of the authorized capital stock in A.M.C. has been issued and is now outstanding, and is owned and held by Alabama residents. None of these stockholders of A.M.C. have contracts with A.M.C. as 'founders'. The defendant Fred Worsham is president of A.M.C., is a male resident of the State of Alabama over the age of twenty-one (21) years, and resides at Eight Country Club Drive in Tuscaloosa; the defendant R. J. Fusilier is a vice president and employee of A.M.C., is a male resident of the State of Alabama over the age of twenty-one (21) years, and resides at 1017 Herring Street in Bessemer.

"A.M.C.'s contracts with its 'founders', which include the instruments attached to the Bill of Complaint as Exhibit A (hereinafter referred to as the 'contract(s)') have not been registered as securities, and the defendants have not complied with the provisions of Title 53, of Volume 12, Ala.Code 1940 (Recompiled 1958).

"In and for the Birmingham market area A.M.C. initially appointed four 'supervisors', choosing four adult males who are in a position to devote a considerable amount of time to the business. This initial appointment of the four supervisors by A.M.C. did not involve any sales, exchanges or consideration, or result in any bilateral contracts between A.M.C. and these initial supervisors. These four supervisors have the primary responsibility for securing the 'founders' in the Birmingham market area. The number of 'founders' in any one market center is limited to 3,000.

"These supervisors establish 'distributors' by selling them an article which the purchaser may choose from a limited selection. (If the purchaser elects not to select an article from this limited selection then he may wait until the store is open and select a comparable product of his choice.) The distributor pays $320 for the article, or for his right to select an article in the future. The supervisor is paid a $70 commission out of this one-time retail sale by the distributor for $320; the remaining amount of $250 is allocated as follows: $18 sales tax, $2 for a sales kit which is given to the distributor, with the remaining portion allocated to restock market center inventory and as a sales receipt to A.M.C. A material part of the inducement for this purchase for $320 is the right to become a distributor and the anticipation of receipts pursuant to the operation of the contract.

. "In conjunction with this purchase from A.M.C. whereby the purchaser becomes a 'distributor' pursuant to the contract, he is given (as a distributor) 100 numbered plastic IBM 'purchase authority' cards. The distributor then attempts to place his 100 cards with persons whom he believes to be potential retail purchasers from A.M.C. When a distributor selects a person as a recipient of a purchase authority card that person signs for the card which is numbered for use in the IBM program. Receipt of a purchase authority card in no way obligates the holder then or ever to use the card and make any purchases from A.M.C. In distributing his cards, through personal contact with sales literature, the distributor encourages the recipients of his purchase authority cards to make purchases from A.M.C. due to the available wholesale prices. Total purchases made by each purchase authority card holder are calculated monthly by an IBM computer. The distributor who placed the purchase authority card then receives a sales commission of from 12% to 20% (depending upon the articles purchased) on the total purchases made by each of his purchase authority card holders. This sales commission is a direct incentive to the distributor to encourage his purchase authority card holders to make their purchases from A.M.C. This sales commission received by the distributor is paid to him by A.M.C. only upon purchases made by the people to whom he has distributed his purchase authority cards. A distributor does not receive this sales commission on purchases by persons who have received their purchase authority cards from any other distributor.

"A distributor has the right to 'establish' other distributors under his supervision in the same manner in which he became a distributor. A distributor can make a one-time retail sale to another for $320, thus establishing his purchaser as a distributor The selling distributor receives a commission of $60, out of this $320 sales price, and his supervisor receives a commission of $10 from this amount. The purchaser then becomes a distributor under his seller's super-

visor. A distributor gains a $200 credit by establishing another distributor if and when the selling distributor seeks to be elevated to supervisor by his supervisor. (This is explained more fully hereinafter.) Apart from this one-time retail sale, the selling distributor does not have a direct right to receive any commissions from the purchases made by the purchase authority card holders of the distributor he has established (or of any other distributor). The purchasing distributor, of course, never receives any fees or commissions of any kind from the distributor who sold to or established him, or based on his sales.

"A supervisor earns a 3% to 5% commission (depending upon the articles purchased) on the purchases made by the purchase authority card holders of the distributors under him. A supervisor receives this sales commission only upon sales made by A.M.C. to those persons who have received purchase authority cards from a distributor who has been established (through the one-time purchase as aforesaid) by or under that particular supervisor. The supervisor receives monthly a report of purchases made with the purchase authority cards placed by his distributors. He meets at least monthly with his distributors to give them these sales reports and to stimulate their efforts in contacting their respective purchase authority card holders. Through the IBM program each supervisor is able to advise his distributors as to the exact extent that the particular distributor's purchase authority cards are being used. Since there is no obligation on the purchase authority card holder to ever make any purchases, a supervisor encourages a distributor under him to collect purchase authority cards from persons who have not made any purchases over a period of some months.

"Supervisors can establish other supervisors but only from among those persons who are established as distributors directly by them or by distributors under them. When a supervisor does this, he loses the 3% to 5% sales commissions from the purchases made by that distributor's purchase

authority card holders. By purchasing a second article from A.M.C. through his supervisor for $300 (in the manner and under the circumstances that he made his initial purchase to become a distributor), a distributor can pay his supervisor $1800, as liquidated damages, and thereby become a supervisor himself. This $1800 figure is reduced by a $200 credit (up to nine such credits) which the distributor has earned for each distributor he has 'established.' Where a supervisor establishes a distributor, and then that distributor, sells to and establishes nine other distributors, then the selling distributor is entitled to become a supervisor without paying any liquidated damages to his supervisor. Upon becoming a supervisor he thereby retains for himself the 3% to 5% sales commissions on purchases made by his purchase authority card holders, which formerly or up to that time were being received by his supervisor. (The distributor by becoming a supervisor therefore not only receives 12% to 20% sales commissions as a distributor, on purchases by his purchase authority card holders, but also the 3% to 5% sales commission as a supervisor.) A distributor who thus becomes a supervisor then has the right to establish other distributors and thereby receive the 3% to 5% sales commissions from purchases made by the purchase authority card holders of his distributors. Unless and until such a newly established supervisor establishes a distributor he has no right to this 3% to 5% sales commission except on purchases made by his own 100 purchase authority card holders. (He earns this same sales commission from distributors he establishes and from distributors under him 'established' by his distributors.) Each distributor who establishes himself as a supervisor in this way does not receive any sales commissions other than on purchases made by holders of purchase authority cards placed by distributors under him, or through the 100 purchase authority cards he had personally placed as a distributor. When a distributor becomes a supervisor, A.M.C. does not in any way share in the $1800 (or lesser sum) paid to the supervisor by that distributor.

"A supervisor pays a $20 monthly service fee to A.M.C. which is deducted through IBM from the sales commissions payable to him. A distributor pays a $14 monthly service charge. If the distributor was established directly by his supervisor, $6 of this monthly service fee is paid to his supervisor; if the distributor was established by another distributor then $4 of this monthly service fee is paid to the distributor establishing him, and $2 goes to his supervisor. If a distributor elects not to pay this monthly service charge, then the may do so on the basis that his sales commissions on purchases made by his purchase authority card holders are reduced to from 6% to 10%. In this event the distributor who directly established him as a distributor, in lieu of receiving $4 of the monthly service fee, receives 6% to 10% of the purchases made by the purchase authority card holders of this distributor whom he has established. In this situation the supervisor of the distributor who does not pay the service fee receives nothing, which operates as an incentive to the supervisor to keep all distributors under him actively encouraging their purchase authority card holders to buy from A.M.C.

"A supervisor does not receive any sales commission other than upon sales made by A.M.C. to purchase authority card holders of distributors under that supervisor. All percentages of sales paid to supervisors and distributors are calculated through an IBM program maintained by A.M.C. Each purchase authority card is an integral part of the IBM program. No supervisor or distributor is paid or entitled to any receipts based upon the total net or gross sales of A.M.C. or any receipts in any way calculated upon the profits of A.M.C.

"No contract has been effected with, or offered to, anyone as a 'dealer', and the provisions of the contract relative thereto are not germane to the issue."

Title 53, § 36 (j) defines a security as follows:

> " 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease, annuity contract unless issued by an insurance company, bankers' shares, trustees' shares, investment participating bonds, investment trust debentures, units, shares, bonds, and certificates in, for, respecting or based upon any form of securities or collateral, subscriptions and contracts covering or pertaining to the sale or purchase on the installment plan of any security as herein defined; or subscriptions or contracts covering or pertaining to the sale or purchase of beneficial interest in title to property, profits or earnings; or any right to subscribe to any of the foregoing; or any instrument of any kind commonly known as a security."

No Alabama case has construed this section, but inasmuch as it is identical with the Federal statute many cases from the Federal courts, including the Supreme Court of the United States are available. The trial court found that the test set forth in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, when applied to the facts in this case compelled the conclusion that the arrangement involved here did not constitute an investment contract. We must agree. In that case the Supreme Court of the United States said:

> " * * * an investment contract * * means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. * * *
>
> "The test is whether the scheme involves an *investment of money in a common enterprise with profits to come solely from the efforts of others.*" (Emphasis added.)

The *Howey* test has been universally followed in determining what constitutes an investment contract within the meaning of the Securities Act of 1933 (which as noted is identical with the Alabama statute).

Roe v. United States, 287 F.2d 435 (5th Cir. 1961); Los Angeles Trust Deed & Mortgage Exchange v. S. E. C., 285 F.2d 162 (9th Cir. 1960); Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), petition for cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954); Darwin v. Jess Hickey Oil Corp., 153 F.Supp. 667 (N.D.) Tex.1957).

The test is consistent with the thinking of Professor Loss, probably the foremost expert on securities law in this country, who said:

> "The line is drawn * * * where neither the element of a common enterprise nor the element of reliance on the efforts of another is present."—Loss, Securities Regulation, Vol. 1, 491 (1961)

We come then to a determination of whether the profits made by the supervisors and distributors here depend solely upon the efforts of others. Clearly not. It is apparent from the facts set forth above that the commissions received by these people depend not upon the efforts of third persons, but upon their own efforts. They are paid sums dependent upon sales made by the Alabama Market Centers to customers procured through their efforts. A distributor receives no compensation or commissions unless the persons to whom he delivered purchase cards make purchases at the

Alabama Market Center. A supervisor receives no money unless sales of merchandise are made to people who have received purchase authority cards from a distributor who has been "established" by that particular supervisor.

It seems clear that any commissions received by a distributor or supervisor are dependent upon the efforts of these distributors and supervisors. The record indicates that the supervisors hold regular meetings with their distributors to review the sales made by their purchase card holders. If a card holder has not made a purchase within a period of months, the distributor is encouraged to retrieve the card and replace it with a new customer, hopefully one who will buy more. It appears to us that what is involved here is a unique merchandising method.

The appellant's argument that the investor (distributor and supervisor) is led "to expect profits solely from the management and control of the store itself" is not consistent with the facts to which he stipulated. On the contrary, it appears that the profits he receives are largely dependent upon his own efforts.

The case most closely related to the case at hand is Emery v. So-Soft of Ohio, Inc., Ohio App., 199 N.E.2d 120 (1964). In that case the plaintiff sought to rescind a sales agreement made with the defendant on the basis that their agreement with the defendant was a "security" which defendant had failed to register. Defendant sold plaintiffs a "water softener" for $648 which had a retail market value of $300. In conjunction with the sale the defendant issued to the plaintiffs a "referral agreement" which had motivated the plaintiffs to purchase the water softener. This agreement provided that the defendant pay the plaintiff $100 for each name submitted to defendant by plaintiffs which resulted in a sale by defendant of a water softener to each such prospect. The court found that the referral agreement was not a security saying:

"There is merely an offer for a unilateral contract on the part of So-Soft to the effect that it will pay the plaintiffs a specified amount of money if they perform certain acts. Upon performance of those acts, the plaintiffs accept the unilateral offer and it becomes a binding contract and So-Soft becomes liable under its terms.

\*    \*    \*    \*    \*    \*

"We are in complete accord with the trial court's ruling that the distinguishing feature between the referral agreement and a security under the Ohio Securities Act is that any profit or return to a party based on the referral agreement in question must result from the personal efforts of the party receiving the profit or return."

Accordingly, we must agree with the trial court that the founders contracts involved here are not investment contracts under the Alabama Securities Act. The profits are not dependent upon the efforts of third parties, but are dependent upon the efforts of the "investor". Hence, there is no investment contract. This being the only issue presented, the decree appealed from is affirmed.

AFFIRMED.

LIVINGSTON, C. J., and COLEMAN and KOHN, JJ., concur.