BOWEN, Judge.
The defendant was indicted and convicted for selling a security in an insolvent corporation. Code of Alabama, Section 8-6-20 (1975). A jury trial was waived and sentence was fixed at three years’ imprisonment.
The controlling questions in this case are whether the “Satellite Laboratory License Agreement” and the “Trans-Lab License Agreement” entered into by the defendant with Alvin Lamar Sims are securities within the purview of the Securities Act of Alabama, particularly Section 8-6-20 prohibiting the sale of any security of an insolvent company.
The trial court found both agreements to constitute securities as investment contracts. On authority of Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2d 841 (1968), we find that the agreements are not within the meaning of investment contracts as defined in Gallion.
The trial court set forth its finding of facts and conclusions of law.
“STATEMENT OF FACTS IN THE CASE IN CHIEF”
“International Diagnostic Testing Corporation, hereinafter TDTC’, was incorporated in Alabama on May 26,1976. IDTC began its franchising activities on December 16, 1976, with an advertisement in The Wall Street Journal offering for sale IDTC ‘Satellite Laboratory’ franchises and ‘Translab’ franchises.
“IDTC was a minimum capital corporation and suffered financial ills from the time it was incorporated until it went out of business.
“The Medi-Test system of IDTC was a system which revolved around a ‘reference laboratory’ or a ‘home laboratory’, *644 which had the capability of performing medical tests of a highly complex nature. The home laboratory, which was located on Goodwin Crest Drive in Birmingham, Alabama, was equipped with a ‘SMAC’ computer, a very advanced and very expensive computer which could conduct numerous and complicated medical tests in a matter of a few minutes. A ‘satellite laboratory’ was a laboratory in which less complicated medical tests were to have been performed. It was the general scheme of IDTC that the satellite laboratory would conduct approximately 70 to 75 percent of the medical tests it received, while the remaining 25 to 30 percent of the tests would require the more sophisticated testing facilities of the reference lab or home lab. For these tests sent by the satellite lab, the reference lab was to keep 60 percent of the retail price of the test and the difference was to have been profit to the satellite laboratory. There were to have been no fees or royalties paid to the reference lab for work performed by the satellite lab.
“The function of the ‘Translab’ franchise was to secure accounts for the reference laboratory and to merely act as a collection station for tests to be transmitted to the reference laboratory. No medical testing whatsoever was to have been conducted by the Translab. The Translab franchise was to keep 30 percent of the retail price of the tests performed by the home lab as a collection fee.
“Early in January, 1977, Alvin Lamar Sims, attracted by the advertisements in The Wall Street Journal, entered into negotiations with James E. Burke, an agent of IDTC, for the purchase of a Satellite Laboratory franchise. On February 11, 1977, the sale of said franchise was consummated for a $15,000 franchise fee.
“The Satellite Laboratory franchise purchased by Alvin Lamar Sims was to have been established in the Columbus, Georgia, area. The Satellite Lab was to function as previously described.
“IDTC was to have assisted Mr. Sims in these ways:
‘1. All phases of the laboratory setup
‘2. Training of Mr. Sims
‘3. Securing proper personnel for the laboratory
‘4. Laboratory design, equipment and required license procurement
‘5. Financing the venture
‘6. Lease procurement and location’
“Few, if any, of the above services were ever provided; in fact, IDTC’s refusal to disclose its shaky financial status prevented Mr. Sims from obtaining additional funding. This Satellite Laboratory franchise was never established.
“Further, IDTC retained restrictions over the satellite laboratory:
‘1. No lease shall be entered into on Mr. Sims’ behalf without the written approval of IDTC.
‘2. No person shall be employed without the consent of IDTC.
‘3. No local advertising by Mr. Sims without prior approval of IDTC.
‘4. IDTC had the right to enter and inspect the premises at all reasonable times.
‘5. IDTC had the right to assume temporary management and control for a stated period should certain deficiencies not be corrected within a period of one month after notice thereof.’
“IDTC represented to Mr. Sims that he could begin his new business within 30 days of the purchase of the Satellite Laboratory franchise, but he later learned it would take as long as 90 days to obtain the needed licensing to conduct the new business.
“Mr. Sims, having quit his job in anticipation of his new venture, was without an income; therefore, he entered into an additional contract with IDTC. Mr. Sims purchased a Translab franchise from James E. Burke, an agent of IDTC, for a franchise fee of $5,000. The Translab was to be conducted in Lee County, Alabama, under the licenses of IDTC, and Mr. Sims was to go into the Georgia area when the Satellite Lab license was obtained.
*645 “The function of this Translab was to have been the same as previously described. IDTC was to give the same aid and hold the same restrictions as were set forth in the above Satellite Lab franchise. In addition to the above, IDTC was to establish 10 accounts, or a break-even point, for the new franchise. This was never done. IDTC was to furnish the initial materials for gathering specimens for testing. This also was not done. The Translab franchise was never prosperous and only operated for a short time.
“The ‘SMAC’ computer, which was the heart of the contract, and the remaining laboratory equipment, including the physical plant, were in constant jeopardy because the necessary rents had not been paid by IDTC.
“Mr. Sims had no managerial or technical expertise in the medical testing field. Mr. Sims’ degree was in Business Administration. Thus, the franchises were dependent for success on the ability of IDTC to perform services for them. The franchises had no managerial control over IDTC.
“IDTC was insolvent as defined in Title 8, Section 6-20, Code of Alabama, 1975, at the time Alvin Lamar Sims purchased the two franchises. James Edgar Burke, acting in his capacity as agent for IDTC, sold the said franchises to Mr. Sims and failed to disclose the fact of insolvency to him.”
“CONCLUSIONS OP LAW”
“The facts were stipulated. The trial court hereby concludes on oral testimony and the stipulation that the sale of franchises (Satellite Laboratory Franchise and Translab Franchise) does constitute an investment contract within the scope of the term ‘security’ as defined in the Alabama Securities Act, Section 8-6-2(10), Code of Alabama 1975.
“The single issue presented was whether or not such a sale was within the meaning of security as defined in the Alabama Securities Act. It is obvious from the stipulated facts presented that the sale of Translab franchise was within the scope of the term ‘security’, even in the strict interpretation of the Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2nd[2d] 841, 1968, and S.E.C. v. W. S. [J.] Howey Co., 328 U.S. 293 [66 S.Ct. 1100, 90 L.Ed. 1244]. Both Howey and Gallion set forth a three-pronged test to determine what does constitute a sale of securities. The test is:
‘(1) Investment of Money in a common enterprise,
‘(2) Expectation of profits, and
‘(3) To be derived solely from the efforts of the promoter or third persons.’
“From the examination of this test and the facts set out above, it is obvious that the Translab Franchise purchased by Mr. Sims does fall within the scope of this test. I.D.T.C. contractually guaranteed to secure for the investor the initial accounts so that the income derived from these acquired accounts would equal the necessary expenses of the investor’s operation, (a so-called break even point). The investor looked solely to the efforts of I.D.T.C.’s management to generate the promised income and profits. In return for a substantial one-time fee, the investor was to receive (1) business surveys, (2) market survey, (3) financial assistance, and most important, (4) the use of I.D.T. C.’s medical testing facilities, equipment, staff and S.M.A.C. computer.
“Translab merely being a collection station for specimens being shipped to the reference laboratory in Birmingham, Alabama, for testing, had no control of its own fate. For the franchisee had absolutely no managerial control over any of the medical testing facilities of the reference lab or of I.D.T.C., and even operated under I.D.T.C. license. Thus, the success or failure of I.D.T.C. solely dictated the success or failure of the Translab franchises.
“A more difficult question is presented as to whether or not the sale of Satellite Laboratory franchises is an investment contract within the scope of the term ‘security’ as defined in the Ala. Securities *646 Act, supra. The Satellite Laboratory franchise does not fall within the strict interpretation of the Howey and Gallion (supra) cases. For under this agreement the franchisee success or failure is not solely linked to the success or failure of I.D.T.C., but was substantially so linked. “Since the United States Supreme Court’s decision in Howey (supra) and the Alabama Supreme Court’s decision in Gallion (supra), the growing number of fraudulent schemes practiced on unwary investors has prompted courts throughout the country to re-examine the three-pronged test it suggests, (set forth above), and expand the definition in order to provide the protection the legislation intended.
“In S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 Fed.[F.]2d [476] 482, the Ninth Circuit Court of Appeals stated:
‘We hold . . . that the definition of securities should be a flexible one, the word ‘solely’ should not be read as strict or literal limitation on the definition of an investment contract but rather must be construed realistically

‘We adopt a more realistic test, whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.’
“In the Glenn Turner case Id. 477 the court further stated:
‘The very purpose of the statute would be violated if they were construed to apply only to the familiar and conventional transactions and were not capable of adaption to novel and irregular schemes fairly covered by the intent and text of the statutes.’ Thus, the Supreme Court has said that in interpreting these acts, ‘form should be disregarded for substance and the emphasis should be on economic reality.’
“In reversing a Georgia District Court, the Fifth Circuit Court of Appeals in S.E.C. v. Koscot Interplanetary, Inc. 497 Fed.[F.]2d 473 (1974), adopted the broader definition announced in Glenn Turner (supra). Judge Gwin writing for the Fifth Circuit Court of Appeals stated:
‘We confine our holding to those schemes in which promoters retain immediate control over the essential managerial conduct of an enterprise and where the investor’s realization of profits is inextricably tied to the success of the promotional scheme.’
“The Koscot case then stated the liberal interpretation intended by the Supreme Court in the Howey case:
‘the definition of securities, embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.’ The Koscot case then went on to say:
‘We merely endorse a test which is resilient enough to encompass the egregious promotional schemes purveyed Koscot.’
“The language used by Judge Gwin reflects the true and proper intent of the Alabama Securities Act. That is to say, the state court merely endorses a test which is resilient enough to encompass the egregious promotional schemes purveyed by James E. Burke.
“It is obvious that neither the Alabama Securities Acts nor the Federal Securities Acts were designed to encompass a conventional franchise agreement, wherein the promoter exercises merely remote control over the franchisee and the franchisee conducts his business independently from the promoter.
“In the instant case the success of any one of I.D.T.C.’s franchisee was inextricably linked to the success of the whole I.D.T.C. operation. Without I.D.T.C.’s medical testing services (represented as ‘one of the country’s best laboratories with almost limitless capabilities, medical staff, market surveys, S.M.A.C. computer, financial assistance, licensing assistance’), an individual franchisee could not function. Thus, the franchisee had no practi *647 cal control over the success or failure of his own franchise.
“Therefore, the sale of the Satellite Laboratory Franchise does fall within the scope of the expanded Howey test as set forth in the Glenn Turner case and the Koscot case and is an investment contract with the scope of the term ‘security’ as defined in the Alabama Securities Act.”
The enforcement provisions of the Alabama Securities Act are applicable only if the financial arrangement involved is a security. By statutory definition an “investment contract” is a security. An investment contract is not defined by statute. The test “universally followed” in determining what constitutes an investment contract was stated in Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).
“(A)n investment contract means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . .”
******
“The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.” Howey, 66 S.Ct. at 1102 and 1104.
This test was adopted by the Alabama Supreme Court in Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2d 841 (1968). Gallion is the only Alabama appellate case interpreting the definition of an investment contract. Gallion held that the merchandising method involved was not an investment contract because the profits the investor received were largely dependent upon his own efforts. Since the investor in the instant case, under both agreements, was required to exert more effort and engage in greater participation in producing any profits in which he would share than the investors in Gallion, the Trans-Lab License Agreement and the Satellite Lab License Agreement cannot be considered as securities.
In Gallion, a distributor (investor) received no compensation or commissions unless the persons to whom he delivered “purchase cards” made purchases at the defendant’s store. A supervisor (investor) received no money unless sales of merchandise were made to people who had received purchase authority cards from a distributor who had been “established” by that particular supervisor. Gallion, 282 Ala. at 684-5, 213 So.2d 841. The court stated that it was apparent that the commissions received by a distributor did not depend upon the efforts of third persons, but upon sales made by the defendant to customers procured through the distributor’s own efforts.
Under the Trans-Lab License Agreement, the investor was primarily responsible for the operation of the Medi-Test Trans-Lab Collection Station in his non-exclusive territory. After the first twelve months of operation he was required to produce a minimum gross sales of $2,000.00 per month of testing to be done by Medi-Test at its Birmingham laboratory. The investor was required to “devote full time, energy and effort to the management and operation of the collection station. Under the terms of the license agreement, the investor was an ‘independent agent’ ”.
Under the Satellite Program, even more “effort” was required by the investor. Brochures of the International Diagnostic Testing Corporation stated that “(t)he development of your expertise in sales and sales management is the key to your success— and ours. * * * Medi-Test has established a program whereby you, the Licensee, are not limited in either your authorization or your financial growth. Your profit is directly dependent on the efforts of you and your staff. * * * Licensees’ income is limited only by ambition, efficiency, and ability.”
In reaching this conclusion we recognize the criticism which a literal and mechanical interpretation of the Howey test has received. Securities & Exchange Commission v. Koscot Interplanetary, Inc., 497 F.2d 473 (1974); Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc., 474 *648 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). See also R. Freedman, An Analysis of The Franchise Agreement Under Federal Securities Laws, 27 Syracuse L.Rev. 919 (1976); B. Goodwin, Franchising In The Economy: The Franchise Agreement As a Security Under Securities Acts, Including 10b-5 Considerations, 24 Business Lawyer 1311 (1969); J. Long, An Attempt to Return “Investment Contracts” to the Mainstream of Securities Regulation, 24 Oklahoma L.Rev. 135 (1971); Comment, Franchises: Compelling Full Disclosure in Franchise Agreements, 5 Cumberland-Samford L.Rev. 919 (1975); Comment, What Is A Security? Howey, Turner Enterprises, and Franchise Agreements, 22 Kansas L.Rev. 55 (1973); Note, Franchise Sales: Are They Sales of Securities? 34 Albany L.Rev. 383 (1970); Note, Securities Regulation—Glenn Turner: Closer to Economic Realities, 52 North Carolina L.Rev. 476 (1973).
While the arguments against a literal interpretation of the Howey test are very persuasive, this Court is bound by the opinions of the Supreme Court of Alabama. Coalite, Inc. v. Aldridge, 285 Ala. 137, 229 So.2d 539 (1969); State v. Deaton, Inc., 355 So.2d 378 (Ala.Civ.App. 1978); Holmes v. State, 342 So.2d 28 (Ala.Cr.App.), cert. denied, 342 So.2d 36 (Ala. 1976).
Consequently, this judgment of conviction must be reversed and remanded on authority of Gallion. Under this holding, it is not necessary to treat the other issues raised by the defendant on this appeal.
REVERSED AND REMANDED.
All Judges concur.