[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1148 
Appellant, a California real estate appraiser, was indicted in a three-count indictment with aiding, abetting, encouraging or otherwise assisting Vanguard Security Life Insurance Company, an Alabama corporation, in a securities fraud in violation of Act 542, now codified as Ala. Code § 8-6-17 (1975). Appellant was properly arraigned in the presence of counsel and interposed a plea of not guilty. Appellant was convicted as charged and the jury assessed a fine of $4,000.00. As additional punishment the trial court sentenced appellant to three years in the state penitentiary. These penalties are provided in Alabama Code § 8-6-18 (1975). After sentencing, appellant gave notice of appeal and is represented here by counsel of his choice as he was at trial. The trial court ordered appellant's sentence suspended pending this appeal.
Omitting only its formal parts, appellant's indictment is set out as follows:
 "Count I . . . Pete J. Buffo, whose name is to the Grand Jury otherwise unknown, did, in connection with the offer, sale, or purchase of any security, to-wit: Surplus notes issued by Vanguard Security Life Insurance Company, a corporation, (hereinafter referred to as Vanguard), directly or indirectly employ a device or devices, scheme or schemes, or artifice or artifices to defraud, to-wit: the said Pete J. Buffo did aid, abet, encourage or otherwise assist Vanguard to falsify, inflate, or exaggerate appraisals of certain real estate owned or held by Vanguard, in that on two occasions the said Pete J. Buffo did provide appraisals on real estate in Palm Springs, California owned or held by Vanguard; and further, that the said Pete J. Buffo knew or should have known that the said appraisals would be submitted by Vanguard to the Insurance Commission of the State of Alabama, (hereinafter referred to as the Commission) in accordance with the laws of the State of Alabama and provide in whole or in part the monetary basis, economic foundation, or capital assets upon which the commission could determine the standing of Vanguard to do business in the State of Alabama; and further, that relying on the falsified, inflated or exaggerated appraisals, the Commission did allow Vanguard to do business in the State of Alabama, contrary to Act 542, Section 1, Regular Session of the Legislature of Alabama, 1959, . . ."
 "Count II . . . Pete J. Buffo, whose name is to the Grand Jury otherwise unknown, did, within five years of the finding of this indictment, in connection with the offer, sale, or purchase of any security, *Page 1149 
to-wit: Surplus notes issued by Vanguard Security Life Insurance Company, a corporation, (hereinafter referred to as Vanguard), directly or indirectly make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to-wit: the said Pete J. Buffo did aid, abet, encourage or otherwise assist Vanguard to falsify, inflate, or exaggerate appraisals of certain real estate owned or held by Vanguard, in that on two occasions the said Pete J. Buffo did provide appraisals on real estate in Palm Springs, California, owned or held by Vanguard; and further, that the said Pete J. Buffo knew or should have known that the said appraisals would be submitted by Vanguard to the Insurance Commission of the State of Alabama, (hereinafter referred to as the Commission) in accordance with the laws of the State of Alabama and provide in whole or in part the monetary basis, economic foundation, or capital assets upon which the Commission could determine the standing of Vanguard to do business in the State of Alabama; and further, that relying on the falsified, inflated or exaggerated appraisals, the Commission did allow Vanguard to do business in the State of Alabama, contrary to Act 542 Section 1, Regular Session of the Legislature of Alabama, 1959,. . . ."
 "Count III . . . Pete J. Buffo, whose name is to the Grand Jury otherwise unknown, did, within five years of the finding of this indictment, in connection with the offer, sale or purchase of any security, to-wit: Surplus notes issued by Vanguard Security Life Insurance Company, a corporation, (hereinafter referred to as Vanguard), directly or indirectly engage in an act, practice or course of business which operated or would have operated as a fraud or deceit upon any person, to-wit: the said Pete J. Buffo did aid, abet, encourage or otherwise assist Vanguard to falsify, inflate, or exaggerate appraisals of certain real estate owned or held by Vanguard, in that on two occasions the said Pete J. Buffo did provide appraisals on real estate in Palm Springs, California owned or held by Vanguard; and further, that the said Pete J. Buffo knew or should have known that the said appraisals would be submitted by Vanguard to the Insurance Commission of the State of Alabama (hereinafter referred to as the Commission) in accordance with the laws of the State of Alabama and provide in whole or in part the monetary basis, economic foundation, or capital assets upon which the Commission would determine the standing of Vanguard to do business in the State of Alabama; and further, that relying on the falsified, inflated or exaggerated appraisals, the Commission did allow Vanguard to do business in the State of Alabama, contrary to Act 542, Section 1, Regular Session of the Legislature of Alabama, 1959,. . . ."
Alabama Code § 8-6-17 (1975), upon which the indictment is based, reads in its entirety:
 "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
(1) Employ any device, scheme or artifice to defraud;
 (2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 (3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."
The Honorable George Beck testified that, while serving as Deputy Attorney General, he had a telephone conversation with appellant in late spring of 1976. Appellant was in California and Beck was in Alabama. Beck informed appellant he was investigating the operations of Vanguard Insurance Company on behalf of the Alabama Department of Insurance and that he wanted to discuss certain appraisals appellant had made for Vanguard in 1974 and 1976. The appraisals concerned California property located near Palm Springs. Appellant *Page 1150 
told Beck he had made the 1974 and 1976 appraisals and that they were accurate.
On cross-examination Beck stated that the capital account of Vanguard had become impaired and that receivership proceedings were filed against Vanguard because of that deficiency. Beck indicated that appellant talked openly during the conversation which was recorded and volunteered to come to Alabama if necessary. The transcript of this conversation, which was admitted into evidence, bears appellant's frankness out and does not hint of any conspiracy to defraud the Department of Insurance. Nor is the offer, sale or purchase of a security even mentioned.
Beck further testified that Vanguard acquired the California property from Dari-International, Inc., a Washington corporation doing business in California, partially through the issuance of a surplus note, the purported security appellant allegedly conspired with Vanguard to "offer, sale or purchase." In addition to the surplus note, Vanguard was to "pay Dari one half of the net profits derived from the subdivision, development, and sale of the land."
The terms of the surplus note itself were that Vanguard was to pay Dari-International $50,000.00 with 6% interest per annum on or before June 30, 1979, but only if Vanguard's surplus account exceeded $3,100,000.00 as determined in accordance with the insurance laws of Alabama. The surplus note was executed on June 30, 1974 by James L. Hinton and Robert H. Pinkston, the president and treasurer, respectively, of Vanguard. The surplus note was incorporated by reference in the contract for the sale of the two parcels of property in question. This contract was also executed on June 30, 1974 by representatives of Vanguard and Dari-International. Appellant's name or participation in this land purchase transaction is nowhere mentioned in either the contract or surplus note.
The contract instrument does provide that Dari-Internationalwas to furnish Vanguard appraisal reports, prepared by appraisers acceptable to the Department of Insurance of the State of Alabama, demonstrating the present market values of the two parcels to be in aggregate not less than $1,180,775.00. It should be noted the contract provided that, in lieu of the surplus note/division of net profit arrangement previously described, Dari-International had the option to receive eight surplus notes in the amount of $100,000.00, four surplus notes in the amount of $50,000.00 and one surplus note in the amount of $55,777.00. In short, according to the terms of the contract, Dari-International was to give up property just about equivalent in value to what it received from Vanguard and vice versa. Vanguard and Dari-International appeared to be dealing at arm's length and there is no evidence whatsoever that either party fraudulently offered, sold or purchased any security from or to the other. The record is devoid of any evidence that appellant took any part in these transactions at all.
Beck stated on redirect that, on June 3, 1974, appellant submitted an appraisal report to Vanguard valuing one parcel of the California property, the 360 acre tract of "slope property," at $2,000.00 per acre. Appellant's appraisal report, state's exhibit one, was addressed to Leland Jones, the secretary of Vanguard. In the report appellant certified that neither his employment nor compensation was contingent upon the value he reported. Moreover, appellant specifically did not guarantee the information in the report and stated that it could not "be used for any purpose by [anyone] except the addressee without the previous written consent of the appraiser." Again, there is no reference, suggestion or allusion in appellant's appraisal report concerning the offer, sale or purchase of any security, or to any device, scheme or artifice to defraud the Department of Insurance or any other person. Appellant's June 3, 1974 appraisal report on the 360 acre slope property from the record before us was simply an appraisal for Vanguard, whether accurate or not, and nothing more.
Nelson Thompson, an independent real estate appraiser from Los Angeles, California, *Page 1151 
testified that appellant retained his services to appraise the 360 acre slope property on February 24, 1976. Appellant gave Thompson a copy of his 1974 appraisal report in which he had valued the parcel at $2,000.00 per acre. Thompson obtained comparable sales data from Robert G. Hill, a Palm Springs appraiser, prior to compiling his appraisal report for appellant. Also, at appellant's request, Thompson appraised a 290 acre tract of valley property on February 26, 1976. After making his analysis of the two parcels, Thompson valued the 360 acre slope property at $55.00 per acre and the 290 acre valley property between $250.00 and $400.00 per acre. Thompson submitted his reports to appellant on March 2, 1976.
Appellant informed Thompson he could not use his appraisals. "He said I can't use these, he said hell, the appraisal that I put together [in 1974] is much higher, how am I going to look when I send these down with your figures." Appellant told Thompson "for you to get paid we'll have to change this around." Thompson explained to appellant what figures and information would have to be altered and together, Thompson and appellant changed Thompson's appraisals. Thompson's original appraisal was destroyed in appellant's office. Appellant told Thompson Vanguard needed the appraisals for a capital statement. "He implied to me that we would have to at least support his 1974 appraisal or better." The "transformed" appraisals valued the 360 acre tract at $4,000.00 per acre and the 290 acre tract at $5,000.00 per acre. Thompson saw appellant sign the 1976 appraisals and himself supplied a letter stating that he concurred with the "final estimate of fair market value." Appellant "gave me a check and I left."
Thompson reported that the $2,000.00 check "bounced" but that appellant assured him he would "take care of it." On March 10, 1976, appellant called Thompson's office and appeared to be "quite nervous" asking if anyone had contacted him from Alabama. "He said well I understand there's a fellow by the name of Hartley who has been in Palm Springs and he's talked to Robert Hill already and he'll probably be calling you but I wish you wouldn't tell him anything." Thompson stated appellant finally paid him $2,000.00 for his services.
Charles Skinner, an examiner with the Department of Insurance, testified that he examined Vanguard Security Life Insurance Company in 1974 and 1975. Skinner stated that Vanguard was insolvent by $474,000.00 on December 31, 1973. Vanguard's records demonstrated, however, that their insolvency was cured in June or July of 1974 because of the purchase of two parcels of land in California and two parcels in Tennessee. The value attributed to the combined real estate totaled $1,509,918.00. Because of this representation Vanguard appeared to have a net worth of $478,773.00 on December 31, 1974. Skinner stated that, in the absence of the $2,000.00 per acre appraisal on the 360 acre slope property (totalling $720,000.00) submitted by Vanguard to the Department ofInsurance, Vanguard would not have been solvent and would have been placed into receivership at that time. Skinner further stated that the real estate was valued at $3,100,105.00 on December 31, 1975 based on Vanguard's annual financial statement which was filed on March 16, 1976. Thus, the same real estate was represented by Vanguard to have approximately doubled in value between the end of 1974 and the end of 1975.
Skinner testified on cross-examination that appellant did not appear at the Department of Insurance or anywhere else in support of Vanguard's annual financial statements.
On redirect Skinner stated that the surplus note given to Dari-International by Vanguard was not registered under the security laws of Alabama. Skinner referred to the last paragraph of the surplus note which read: "This Surplus Note has not been registered under the Securities Act of 1933, as amended, or any State Securities Law; the issuance and/or negotiation of this Surplus Note, if it is a security otherwise required to be registered, is issued in a transaction not involving any public offering." *Page 1152 
Skinner testified that Vanguard paid very little cash for the California property it purchased from Dari-International. "In the beginning, very little, it may have been $5,000.00 but practically no cash was paid."
Robert G. Hill, a real estate appraiser and broker from Palm Springs, California, testified that Nelson Thompson solicited his help on an appraisal in March, 1976. Hill gave Thompson information concerning comparable properties he had recently appraised near the subject property and provided Thompson with old appraisal reports as a convenience. Hill pointed out various discrepancies between the comparable data he provided Thompson and the information contained in appellant's 1976 appraisal reports for the 360 acre slope property and the 290 acre valley property.
Hill, at the request of the Department of Insurance, conducted independent appraisals of the 360 and 290 acre parcels in April of 1976. Through meticulous and laborious examination Hill explained that, based on his determination, the 360 acre tract was worth $50.00 per acre for a total value of $18,000.00 and that the 290 acre tract was worth $330.00 per acre for a total value of $95,000.00. Hill characterized much of appellant's 1976 appraisal reports as being "absolutely false" or "misleading." Concerning appellant's June 3, 1974 appraisal of the 360 acre tract Hill stated, "I think that it just has to be either a lack of sincere effort in investigating the factors involving value and could very well be a justification of some preconceived figure."
James Robert Carlisle, Chief Examiner with the Department of Insurance, testified that the financial condition of Vanguard Security Life Insurance Company was impaired in 1974. He stated that Vanguard's financial impairment was cured based on the values enumerated in appellant's appraisal.
Paul E. Wallace, an Insurance Examiner serving as Deputy Receiver for Vanguard, stated that Vanguard was placed in receivership on November 29, 1976. Wallace testified that Vanguard did business in Alabama subsequent to June 3, 1974 and had 1880 unpaid claims totaling $2,137,852.66.
At the conclusion of Wallace's testimony the State rested its case. Appellant then moved to exclude the evidence on several grounds, the principal grounds being that the State failed to prove a prima facie case of securities fraud and that no evidence was presented which proved that a conspiracy existed between appellant and Vanguard to defraud the Department of Insurance. Appellant's motion to exclude was denied; however, the trial court did instruct the jury that they could consider the 1976 appraisals only for the purpose of determining appellant's intent since there was no evidence a security was issued in 1976. Consideration of the 1976 appraisals as a substantive crime or for any other purpose than the limited exception was excluded.
Based on the above evidence, and viewing it in the most favorable light to the State, as we are required, Bass v.State, 55 Ala. App. 88, 313 So.2d 208 (1975), we find it insufficient to prove a prima facie case of securities fraud. Appellant's conviction must, therefore, be reversed.
In reviewing the action of the trial court in overruling a motion to exclude the evidence, only the evidence before the trial court at the time the motion was made can be considered.James v. State, 351 So.2d 693 (Ala.Cr.App. 1977); Livingston v.State, 44 Ala. App. 559, 216 So.2d 731 (1968). The standard of review is whether there exists legal evidence before the jury, at the time the motion was made, from which the jury could by fair inference find the accused guilty. Stewart v. State,350 So.2d 764 (Ala.Cr.App. 1977).
Initially, it must be noted that there is not one shred of evidence that appellant conspired with Vanguard "in connection with the offer, sale, or purchase of any security" in order to defraud the Alabama Department of Insurance. Although appellant's indictment is by no means a model of perspicuity, this is essentially what it alleged. All three counts of his indictment charge that appellant "did aid, abet, encourage or otherwise assist Vanguard." The *Page 1153 
indictment does not charge appellant with the substantive offense of securities fraud.
The evidence simply indicates that appellant was hired in 1974 by Vanguard to appraise 360 acres of California property. There is not even a scintilla of evidence that appellant knew his 1974 appraisal would be submitted by Vanguard to the Department of Insurance and that, based on his appraisal, Vanguard would be allowed to stay in business. Appellant's 1974 appraisal, no matter how faulty or exaggerated, in no way linked him to a scheme with Vanguard to practice a fraud upon the Alabama State Department of Insurance.
There is evidence, by way of Nelson Thompson's testimony, that, in 1976, when the 360 acre parcel was "reappraised", appellant knew his appraisal was needed for Vanguard's "capital statement"; however, there is, again, no evidence whatsoever that appellant knew the appraisal would be submitted by Vanguard to the Department of Insurance. Vanguard could have needed a capital statement for a variety of reasons. It is true that in 1976 the evidence is much stronger that appellant's appraisals were the product of deliberate falsification; still there is no hint that appellant had a prearranged plan with Vanguard to defraud the Department of Insurance. At most, Nelson Thompson's testimony revealed that appellant did not want to be embarrassed in front of Vanguard in 1976 after he realized he had probably made a mistake in his 1974 appraisal. "[H]ow am I going to look when I send these down with your figures." Appellant's intent to defraud the Department of Insurance, for which purpose the 1976 appraisals were admitted, was not shown. In all his meetings with Thompson the Department of Insurance was never mentioned. The appraisals were simply being done for Vanguard.
Department of Insurance representatives who testified made it clear that appellant's 1974 and 1976 appraisals were submitted by Vanguard in its annual financial statement and that appellant had no contact with the Department in support of Vanguard's representations. Appellant's June 3, 1974 appraisal report itself specified that it was only to be used by Vanguard and not for any other purpose without appellant's consent. No one from Vanguard testified as to Vanguard's relationship with appellant.
In summary, appellant did not submit either his 1974 or 1976 appraisal report to the Department of Insurance. There is no evidence that he knew or should have known Vanguard would. Appellant only knew Vanguard needed his 1976 appraisals for its "capital statement." But, most importantly, there is absolutely no evidence that appellant conspired in any way, shape, form or fashion with Vanguard to defraud the Department of Insurance. This, in essence, was what was alleged and what had to be proved for appellant's conviction to be sustained. The critical element of intent to be a part of a conspiracy is missing.
When, by prearrangement or on the spur of the moment, two or more people enter on a common enterprise or adventure and a criminal offense is contemplated, each is a conspirator and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. McCovery v.State, 365 So.2d 358 (Ala.Cr.App. 1978). And, while evidence of a conspiracy need not be proved by positive testimony, but may be established circumstantially, Hudson v. State, 354 So.2d 328
(Ala.Cr.App. 1978), the intent to conspire must be shown.Mackreth v. United States, 103 F.2d 495 (5th Cir. 1939). Conspiracy requires a community of purpose, Kendrick v. State,377 So.2d 1112 (Ala.Cr.App.), cert. denied, 377 So.2d 1114
(Ala. 1979), or a meeting of the minds by all the participants.Howell v. State, 339 So.2d 138 (Ala.Cr.App. 1976).
While conspiracy to do an act is evidence tending to connect a defendant with its consummation, there must be some evidence tending to prove a conspiracy before a jury is authorized to reach such a conclusion. Stephenson v. State, 27 Ala. App. 122,166 So. 620 (1936). Furthermore, an alleged conspirator cannot be bound by the acts and declarations of other participants in the conspiracy until after it has *Page 1154 
been established that a conspiracy existed and that he was one of its members. United States v. Maddox, 492 F.2d 104 (5th Cir.), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82
(1974).
In the instant case there is not one scintilla of evidence, either direct or circumstantial, to show that appellant conspired with Vanguard. No community of purpose, meeting of the minds, or conspiracy of any sort between Vanguard and appellant was ever established. To hold appellant a conspirator to defraud the Department of Insurance would be based on sheer speculation, surmise or conjecture.
While a jury is under a duty to draw whatever permissible inferences it may from the evidence, including circumstantial evidence, mere speculation, conjecture, or surmise that the accused is guilty of the offense charged does not authorize a conviction. Thomas v. State, 363 So.2d 1020, 1022 (Ala.Cr.App. 1978); Smith v. State, 345 So.2d 325 (Ala.Cr.App.), writ. quashed, 345 So.2d 329 (Ala. 1976). A defendant should not be convicted on mere suspicion or out of fear that he might have committed the crime. Harnage v. State, 49 Ala. App. 563,274 So.2d 333 (1972). Mere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence. Thomas, supra; Sauls v. State, 29 Ala. App. 587,199 So.2d 254 (1941).
As a corollary to the above principles, the State did not properly establish venue over appellant. This issue was timely raised in appellant's motion to exclude the State's evidence. The record shows that appellant never performed a single act in Alabama, much less in Montgomery County. The 1974 and 1976 appraisals for Vanguard were done in California. Since there was no evidence of a conspiracy between Vanguard and appellant, the acts of Vanguard in Alabama cannot be deemed the acts of the appellant. Williams v. State, 383 So.2d 547 (Ala.Cr.App. 1979), affirmed, 383 So.2d 564 (Ala. 1980).
In a criminal prosecution the accused has a constitutional right to a trial "[in] the county or district in which the offense was committed." U.S. Const. Amendment VI; Ala. Const. Article 1, § 6, Williams, supra. Proof of venue is necessary to sustain a conviction, Grace v. State, 369 So.2d 318
(Ala.Cr.App. 1979), and "must be properly laid to give jurisdiction." Barlow v. Garrow, Minor 1 (Ala. 1820). Unless otherwise provided by law, venue of all public offenses is in the county in which the offense was committed. Stokes v. State,373 So.2d 1211 (Ala.Cr.App.), cert. denied, 373 So.2d 1218
(Ala. 1979). The burden of establishing venue is on the State.Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969). In the instant case, since the State failed to prove a conspiracy it also failed to meet its burden of proof in establishing venue.
Assuming, arguendo, that the State had been successful in proving a conspiracy between appellant and Vanguard to defraud the Department of Insurance, which we have held it was not, appellant's conviction still cannot stand because neither the actions of appellant nor of Vanguard were in violation of Alabama Code § 8-6-17 (1975). This was simply not a case involving securities fraud.
As stated by this court in Manson v. State, 349 So.2d 67, 73
(Ala.Cr.App.), cert. denied, 349 So.2d 86 (Ala. 1977) concerning Section 8-6-17:
 "The quoted provision of the statute is in all respects, other than in the insertion of the word `offer' and that which is necessary to a delineation between the area of sovereignty of Alabama and that of the United States, identical with the language of Rule 10b-5 [17 C.F.R. § 240. 10b-5] of the Securities and Exchange Commission pursuant to its authority under the Securities Act of 1933 (15 U.S.C. § 77a, et. seq.) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a, et. seq.)."
Laws governing the exchange of securities, such as Section8-6-17, are commonly referred to as "blue sky laws." Hall v.Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, *Page 1155 61 L.Ed. 480 (1916). And, as the court noted in Manson, supra, "there is remarkable scarcity of reported cases under `blue sky laws' or the like, whether state or federal." 349 So.2d at 77. In Gallion v. Alabama Market Centers, Inc., 282 Ala. 679,213 So.2d 841, 845 (1968), a securities case involving investment contracts, our Supreme Court acknowledged the appropriateness of turning to federal decisions interpreting federal securities law in construing identical sections of Alabama securities law.
Many of the federal cases cited in appellant's brief, which interpret the application of Rule 10b-5 in civil suits, contain principles which are directly applicable in this case. Without question, the securities act cannot be construed less strictly in a criminal prosecution than in a civil suit. A basic rule of review in all criminal cases is that criminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation, i.e., defendants. Schenher v.State, 38 Ala. App. 573, 90 So.2d 234, cert. denied, 265 Ala. 700, 90 So.2d 238 (1956). Penal statutes are to reach no further in meaning than their words. Fuller v. State, 257 Ala. 502, 60 So.2d 202 (1952).
Before delving into the federal authority which provides basic guidelines in this area, it is necessary to review certain critical facts. The evidence is unequivocal that the security in this case, the surplus note executed on June 30, 1974, was issued by Vanguard to Dari-International. Reading Ala. Code § 8-6-2 (10) (1975) we find:
 "SECURITY. Any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease, annuity contract unless issued by an insurance company, bankers' shares, trustees' shares, investment participating bonds, investment trust debentures, units, shares, bonds and certificates in, for, respecting or based upon any form of securities or collateral, subscriptions and contracts covering or pertaining to the sale or purchase on the installment plan of any security as herein defined, or subscription or contracts covering or pertaining to the sale or purchase of beneficial interest in title to property, profits or earnings, or any right to subscribe to any of the foregoing or any instrument of any kind commonly known as a security." (Emphasis added.)
The surplus note in question was issued as part of a land purchase transaction between Vanguard and Dari-International. Appellant was not involved in this transaction. From all that appears in the record, Vanguard and Dari-International were dealing at arm's length and neither party was defrauded by the other. From the terms of the land purchase contract itself, Dari-International had certain options it could exercise at its election. There is no evidence that Vanguard, "in connection with the offer, sale or purchase" of the surplus note, directly or indirectly (1) employed any device, scheme or artifice to defraud Dari-International; (2) made any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in any act, practice or course of business which operated as a fraud or deceit upon Dari-International.
It is nowhere shown that the value of what Dari-International conveyed to Vanguard was not about the same as the value of the obligation which Vanguard gave Dari-International. Neither Vanguard, its stockholders, creditors, nor the Department of Insurance were adversely affected by the issuances of the surplus note. No investor was victimized. Of even greater importance here, concerning Vanguard's issuance of the surplus note, there is no evidence that appellant was even aware that Vanguard had issued a surplus note in its negotiations *Page 1156 
with Dari-International for the land purchase. In other words, not only is there no evidence of a securities fraud involving Vanguard and Dari-International, there is no indication that appellant was even cognizant that a security had been issued.
Referring now to federal cases which discuss Section 10 (b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 it becomes even more apparent that under the present facts a prosecution for violation of Alabama Code § 8-6-18 (1975) runs far afield of the statute's intended purpose. Foremost in importance in this area, the securities acts have as their fundamental and dominant purpose the protection of investors.McClure v. First National Bank of Lubbock, Texas, 497 F.2d 490,495 (5th Cir. 1974); Little v. United States, 331 F.2d 287, 294
(8th Cir. 1964). In a 10b-5 action any fraud alleged to have occurred must occur in connection with the sale or purchase of securities. Penn Central Securities Litigation, 494 F.2d 528,533 (3rd Cir. 1974). "Congress by 10 (b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." Superintendent of Insurance of NewYork v. Banker's Life Casualty Co., 404 U.S. 6, 12,92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); Penn Central SecuritiesLitigation, supra.
In the landmark case of Birnbaum v. Newport Steel,193 F.2d 461, 464 (2d Cir. 1952), Judge Hand writing for the Second Circuit held the following:
 "[S]ection [10 (b)] was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and . . . [Rule 10b-5 extends] protection only to the defrauded purchaser or seller." (Emphasis added.)
The "Birnbaum rule" has been approved in unequivocal terms by the Supreme Court in Blue Chip Stamps v. Manor Drug Stores,421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). A plaintiff in a civil suit asserting a claim for damages based on violation of Rule 10b-5 "must either be a purchaser or seller of securities." Blue Chip Stamps, supra, 421 U.S. at 749,95 S.Ct. at 1931. Clearly, the statute cannot be less strictly construed in this criminal action. Spurlock v. State, 37 Ala. App. 390,69 So.2d 293 (1953). The Supreme Court in Blue Chip Stamps, supra, recognized that 10b-5 was a private cause of action and did not extend to a nonpurchasing offeree of a stock offering.421 U.S. 754.
It has been recognized that while certain transactions may involve flagrant violations of fiduciary duty that in itself is no justification for straining statutory language to bring the transaction within the prohibitions of the Securities Act of 1933 and the Securities Exchange Act of 1934 which, sensibly construed, do not apply to them. Securities Exchange Com'n v.Fifth Avenue Coach Lines, Inc., 289 F. Supp. 3, 37 (S.D.N Y 1968).
In Chess v. Nieport, 386 F. Supp. 312 (E.D.Cal. 1974), the plaintiff-purchasers of real estate alleged that the defendant conspired and entered into a common scheme to defraud and deceive them by purposely selling them real property at prices much greater than their value and obtaining secret profit and commissions. The plaintiffs alleged that they executed promissory notes and deeds of trust in favor of the defendants in connection with the real estate transaction. In dismissing the plaintiff's action the court stated:
 "The Supreme Court has held that the courts must approach a determination of whether there has been a `purchase or sale' within the Securities Act of 1934 on a case by case basis. . . . The courts must look to see whether the alleged conduct is the type of fraudulent behavior that Congress intended to forbid. . . . In the instant case the court is presented with a land sales transaction involving allegations of fraud and misrepresentation. The `crux' of this transaction was not the sale of an investment security, i.e. the giving of a promissory note in return for money as a part of a scheme to engage victims to invest in money venture. . . . Here the promissory notes *Page 1157 
were exacted from the victims rather than the promoter and they were executed and delivered only as an incident to a double-barreled scheme to skim fraudulently concealed profits from a real estate transaction and to fraudulently misrepresent the value of the real estate in order to encourage its purchase. I cannot find, under the circumstances of this case, where the alleged victims in a fraudulent real estate transaction give a promissory note which is secured by a deed of trust on existing land, the promoters of the allegedly fraudulent scheme are thus involved in the sale of security within the meaning of the Securities Exchange Act." (Emphasis added.) 386 F. Supp. at 314-15.
And in Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3rd Cir. 1976) the Third Circuit held:
 "The `purchase' or `sale' requirement, derived as it is from the actual language of the 1934 Act which makes unlawful any deceptive or manipulative device employed `in connection with the purchase or sale of any security,' contemplates a causal connection between the alleged fraud and the purchase or sale of stock." (Emphasis added.)
The case of Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973) involved a situation where the defendant devised a scheme to defraud the plaintiffs. In furtherance of the scheme, the defendant deceptively purchased securities from a third party. The plaintiffs were not privy to the transaction, but claimed a 10b-5 securities fraud. The Tenth Circuit held:
 "In the final analysis, we have a scheme, a sale, and an injury, but this does not necessarily spell jurisdiction. The question is whether there is a causal connection between the deceptive sale and the injury to the plaintiffs. Although the deceptive purchase was, to be sure, a link in the chain of causation, the plaintiff's injury was the direct result of corporate mismanagement, not of the deceptive purchase. There was, therefore, no requisite causal connection between the deceptive purchase and the plaintiff's injury. . . ." (Emphasis added.)
Alleged fraud arrangements have likewise been held "too remote" to satisfy the "in connection with the purchase and sale" requirement as contemplated by Blue Chip Stamps, supra, in the Fifth Circuit. Wilson v. First Houston Investment Corp.,566 F.2d 1235, 1243 (5th Cir. 1978). The alleged fraud simply must be "intrinsic" to the securities transaction itself. Rich v.Touche Ross Co., 415 F. Supp. 95, 100 (S.D.N.Y. 1976). Further recitation of authority on this issue would serve no useful purpose.
Obviously, the Department of Insurance was not a purchaser or seller of Vanguard's surplus note. The Department of Insurance was by no stretch of the imagination an "investor" in the land purchase negotiations between Vanguard and Dari-International, and it was privy to none of the transactions between the two companies. At most, the Department of Insurance acted as a policing agency over Vanguard's financial affairs, but was far removed from actual participation with Vanguard in the purchase or sale of securities. There was no causal connection at all, even a remote one, between Vanguard's alleged fraudulent misrepresentation to the Department of Insurance and the purchase or sale of any securities, i.e., the surplus note. What is even more unfathomable in this case is appellant's non-existent connection with any of the transactions between Vanguard and Dari-International, or Vanguard and the Department of Insurance, much less his connection in a securities fraud.
Clearly, what the state did was to attempt to combine two causally unconnected transactions, i.e., Vanguard's issuance of a security in order to acquire the land, which did not involve any fraud or deception, and Vanguard's misrepresentations to the Department of Insurance as to the value of the land, a transaction which did not involve the sale of a security. Even had the State been successful in proving that appellant conspired with Vanguard to accomplish both these transactions, which it did not, such structuring of transactions would have *Page 1158 
been insufficient to prove a prima facie case as charged in the indictment.
Although there are other issues raised on this appeal seeking a reversal of this cause, we pretermit their discussion in this opinion since the State failed in its duty to prove a prima facie case. Appellant's motion to exclude the State's evidence was due to be granted. To hold otherwise would be to ignore the plain wording of Alabama Code § 8-6-17 (1975) and set a precedent at odds with all other jurisdictions. Appellant has not been shown to be guilty of the crime for which he was convicted. We have no alternative but to reverse and render appellant's conviction. Burks v. United States, 437 U.S. 1,98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
REVERSED AND RENDERED.
All the Judges concur except BOOKOUT, J., not sitting.